## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: ALL-CLAD<br>METALCRAFTERS, LLC,<br>COOKWARE MARKETING AND<br>SALES PRACTICES LITIGATION<br><br>This Document Relates to All Actions | MDL NO. 2988<br>Master Case No. 21-mc-491-NR |

### **OPINION**

For about the last 50 years, All-Clad has made some of the highest quality cookware on the market. According to its website, All-Clad's cookware (pots and pans) are "fully bonded," "handcrafted by skilled craftspeople using the finest materials and revolutionary bonding process," and deliver "superior performance and durability." Because of this, individual items, like a 1.5-quart stainless steel saucepan, go for about $200 in high-end stores like Williams Sonoma or Crate & Barrel. All-Clad's cookware consists for the most part of high-end products, and its consumers, it would seem, are willing to pay premium prices for these premium products.[1]

These consolidated class-action lawsuits stem not from the essential function or quality of All-Clad's cookware, but from what the Court views as an ancillary benefit. All-Clad marketed certain lines of its cookware as "dishwasher safe." But some of it wasn't; when put in the dishwasher, the bonded layers on the bottoms

---

[1] One consumer on Amazon said this about his All-Clad D3 stainless steel pan: "Solid, quality construction. You can tell that these will last a lifetime, and be passed down for generations to come. Handles are solidly attached. Lids fit snugly like a glove. Nothing flimsy about these. If you take the time to learn how to properly use stainless steel, you'll not have any problems with food sticking, either. Spend the money now, one time, and avoid the ever increasing cost of buying lesser, inferior products again and again every few years. These are an investment in your future gastro-happiness." https://www.amazon.com/All-Clad-Stainless-Dishwasher-Tri-Ply-Bonded/dp/B00FUF5K8W/ref=sr_1_1?crid=11CDCXAAA88G4&keywords=all-clad+d3&qid=1675304172&sprefix=all-clad+d%2Caps%2C111&sr=8-1

would come apart and create sharp edges.  Plaintiffs filed four class actions – which have been consolidated into this MDL – in response to this defect.  They brought claims for breach of express and implied warranties, breach of contract, unjust enrichment, and deceptive and unfair trade practices.

After several rounds of mediation, the parties have settled their case, and now ask this Court to approve a classwide settlement.  After careful consideration, the Court will do so.

The settlement has several options for class members, but the main form of relief is for a class member to return a defective pot or pan for a brand new one (with free shipping) and get a check for $75.00.  That option is more than fair.  After all, if a plaintiff pursued a claim for breach of warranty and won, they would likely only get the value of a new piece of cookware.  Under this settlement, the class member is getting that full relief, plus a little bit of money.  Below, the Court will go through the many factors that it is obligated to apply in assessing the fairness of the settlement agreement.  But in the end, the reality is that obtaining a brand-new replacement product (with no shipping costs), in what the Court views as fundamentally a warranty case, is a fair settlement. This is particularly so where, as here, the defect at issue (not being dishwasher safe) doesn't relate to the core functionality of the product.

The Court must also consider class counsel's motion for about $1.9 million in attorneys' fees, costs, and service awards for the named Plaintiffs.  The Court will use a lodestar method to calculate the fees, and will grant the motion, with modifications. Because the Court finds that one of the main benefits of the settlement is the replacement products to the class members, the Court also finds that it is critical to incentivize class counsel to remain engaged in the claims process, including if there are disputes over claims or problems with the delivery of replacement products.  As such, a portion of the fees will be held back, and authorized for payment only after

the claims process is complete.  Finally, the Court sees no basis to award the named class representatives any service awards, and so will decline to do so here.

## BACKGROUND

This MDL comprises several lawsuits filed by Plaintiffs claiming that though All-Clad marketed its D3, D5, and LTD Stainless Steel Collections as dishwasher safe, the cookware begins to deteriorate and develop sharp edges after dishwasher cleaning. ECF 91-1, p. 2. Specifically, the cookware has "a top layer of 18/10 stainless steel followed by a second layer of aluminum," but "[w]hen immersed with the stainless steel in the dishwashing detergent, the aluminum and steel form a galvanic couple that produces accelerated etching and corrosion of the aluminum," which ultimately yields a "thin, sharp top layer of stainless steel[.]"  No. 21-cv-504, ECF 1, ¶¶ 46, 50.  The named Plaintiffs brought claims including breach of express and implied warranties, breach of contract, unjust enrichment, and deceptive and unfair trade practices, among others.  No. 21-cv-504, ECF 1; No. 21-cv-505, ECF 1; No. 21-cv-506, ECF 1; No. 21-cv-507, ECF 1.  Product investigations before and during litigation substantiated these claims. *See id.* at pp. 2-3.

Specifically, class counsel retained well-qualified metallurgy and materials experts to perform failure analysis of the cookware.  The experts collectively performed extensive pre-suit investigations, including microscopy with Energy Dispersive Spectroscopy evaluation, Scanning Electron Microscopy evaluation, Hirox 3D scanning, and macroscopic photography of the metals used to construct the cookware, as well accelerated dishwasher testing, and research of the product specifications, use and care manuals and instructions, industry standards, and alternative feasible designs. ECF 92, PDF pp. 7-8.  According to class counsel, the experts concluded that the cookware was not dishwasher safe when using any detergents.

After extensive briefing of various pre-discovery and discovery-related motions, as well as multiple rounds of mediation, the parties negotiated the settlement agreement for which they seek approval. *Id.* Before the Court are Plaintiffs' motions for final approval of class action settlement and Plaintiffs' motion for attorneys' fees, litigation costs, and service awards. ECF 91; ECF 82. After granting preliminary approval on August 25, 2022, the Court held a final approval or fairness hearing on January 26, 2023.

## SETTLEMENT CLASS CERTIFICATION

As a threshold matter, the Court first finds that the proposed settlement class satisfies the requirements of Federal Rule of Civil Procedure 23. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 778 (3d Cir. 1995) ("Settlement classes must satisfy the Rule 23(a) requirements … as well as the relevant 23(b) requirements[].").

This settlement class consists of:

> "[a]ll persons in the United States, including Puerto Rico and the District of Columbia, who, since January 1, 2015, have purchased All-Clad D3, D5, or LTD Cookware. Excluded from the Settlement Class are Defendants, as well as Defendants' affiliates, employees, officers, and directors, attorneys, agents, insurers, and the attorneys representing Defendants in this case; the judges and mediators to whom this case is assigned and their immediate family members; all persons who request exclusion from (opt-out of) the Settlement; anyone claiming personal injury, property damage (other than to their Cookware), or subrogation; and all persons who previously released any claims encompassed in this Settlement."

ECF 77-1, p. 7. Though the class outlined in the parties' agreement has not formally been certified, this Court's preliminary approval order – entered August 25, 2022 – preliminarily found that the numerosity, commonality, typicality, adequacy,

predominance, and superiority requirements were satisfied.  ECF 78, ¶ 7.  After further review, the Court's preliminary finding was correct.

The Court first turns to the requirements laid out in Federal Rule of Civil Procedure 23(a).

**Numerosity.** To start, the class is clearly so numerous that individual joinder is impracticable.  Over 100,000 claims have been submitted, and 847,386 notices to unique customers have been sent out.

**Commonality.** The settlement class presents common questions of law and fact "of such a nature that…determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Specifically, all claims turn on whether or not the cookware was defective, whether it was marketed as dishwasher safe, and whether All-Clad beached duties or otherwise acted improperly.

**Typicality.**  The named Plaintiffs satisfy the typicality requirement because they suffered the same injury from identical conduct by All-Clad; they purchased the defective cookware marketed as dishwasher safe.  *Newton v. Merrill Lynch*, 259 F.3d 154, 183-84 (3d Cir. 2001) ("If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." (citations omitted)).  Moreover, "concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class." *Sullivan v. DB Invs. Inc.*, 667 F.3d 273, 298 (3d Cir. 2011).

**Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the class.  The named Plaintiffs are adequate representatives because they are similarly situated to the class members, and there is nothing about their claims or the structure of the settlement that creates a conflict of interest between named Plaintiffs and absent class members.  Class counsel are adequate, too.  "Adequate representation requires a two-pronged analysis: (a) the plaintiff's attorney must be qualified,

experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D. 201, 209-210 (E.D. Pa. 2011) (citation omitted). Here, after reviewing class counsel's submitted credentials, reviewing the pleadings that they have submitted, and observing their performance at court hearings, the Court finds that class counsel have ample qualifications and experience to conduct this litigation and negotiate this settlement on behalf of class members.

**Rule 23(b)(3) Requirements.** Next, the Court turns to the requirements of Rule 23(b)(3) (*i.e.*, predominance and superiority). The class satisfies the predominance requirement because "a sufficient constellation of common issues binds class members together[.]" *Sullivan*, 667 F.3d at 297 (cleaned up). As stated above, each injured class member experienced identical conduct by All-Clad, even if their level of injury differs slightly. Moreover, variations under state consumer protection laws are not relevant here because "a settlement would eliminate the principal burden of establishing the elements of liability under disparate laws." *Id.* at 303 (citations omitted). Because of the vast number of customers who experienced such similar injuries, the Court finds that class treatment is superior and will lead to increased "fairness and efficiency." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533-34 (3d Cir. 2004). Finally, the class is clearly ascertainable because the settlement class parameters present objective criteria, and the parties can – and have – identified members through detailed records.

For the foregoing reasons, the Court hereby certifies the class for purposes of settlement.

## <u>THE AGREEMENT</u>

The specific material terms of the settlement agreement are as follows.

## I.   Relief for settlement class members who have experienced the sharp edges issue (Option A).

Settlement class members who are in current possession of the damaged cookware are entitled to select one of the three following options.  ECF 77-1, p. 15.

   A.   Option A1.  Settlement class members selecting this option will submit the damaged cookware to All-Clad.  In exchange, they will receive replacement of the same type/style and apply for a $75.00 refund;

   B.   Option A2.  Settlement class members electing this option will submit the damaged cookware to All-Clad.  In exchange, they will receive either (i) Hard Anodized (HA1) five-piece frypan set (SKU 2100122734) or (ii) Essentials Hard Anodized Nonstick thirteen-piece cookware set (SKU 2100120788); or

   C.   Option A3.  Settlement class members selecting this option will submit the damaged cookware to All-Clad.  In exchange, they will apply for a future credit of 50% off purchases, up to $1,200.00, on All-Clad's website.

## II.   Relief for settlement class members whose cookware has not experienced the sharp edges issue or who have discarded the cookware (Option B).

Option B.  Settlement class members who no longer possess the damaged cookware, or who have the cookware but whose cookware has not yet manifested sharp edges, are entitled to submit a claim for a future purchase credit of 35% off purchases, up to $750.00, on any products on All-Clad's website.  *Id.* at pp. 14-15.

## III.   Settlement fund for Option A1.

Class members who make a claim for Option A1 will receive a cash payment of $75.00.  To fund these payments, All-Clad will establish a "settlement fund"[2] of up to

---

[2] The settlement agreement uses the term "settlement fund."  ECF 77-1.  To be clear, the settlement agreement is a claims-made settlement, with this "fund" set aside to cover and effectively place a cap on the monetary claims for those that select Option A1.  *See* ECF 92-2, p. 14.

$3,000,000 that will provide for the refunds available to settlement class members who are in possession of the damaged cookware and elect to exchange the damaged cookware for a replacement and a $75.00 refund. *Id.* at pp. 18-19. If the amount of refund claims totals less than $3,000,000, All-Clad will create a fund in the actual amount of all such claims. If the amount of refund claims exceeds $3,000,000, All-Clad will add as much money as needed to pay such claims, up to an additional $1,000,000, for a total of $4,000,000. *Id.* If the total amount of refund claims exceeds $4,000,000, the amount paid on each claim will be reduced *pro rata*. *Id.* This fund covers only the $75.00 refunds; any additional product-replacement costs, shipping expenses, class-notice costs, and class-administration costs are paid separately by All-Clad. As discussed at the fairness hearing, these additional costs are substantial. Jan. 26, 2023, Hearing Tr., pp. 26:22-27:19.

## IV.  Packaging and label changes.

In addition, All-Clad affirmed that it completed packaging changes to remove "dishwasher safe" representations from all the cookware packaging and labeling and has also completed removal of "dishwasher safe" representations on the All-Clad website and any other promotional and marketing materials. ECF 77-1 at pp. 15-16. All-Clad also notified its authorized retailers of the removal of the "dishwasher safe" representations and is actively working to instruct retailers to remove "dishwasher safe" representations from floor models and other marketing materials. *Id.*

## V.  Attorneys' fees and costs.

The agreement contains a "clear sailing" provision; All-Clad has agreed not to oppose or assist any third party in opposing class counsel's request for up to $2 million in fees and costs. ECF 77-1, p. 30. The parties represented to the Court that they negotiated this fee arrangement completely separately from the rest of the agreement. Hearing Tr., 37:21-24 ("So we absolutely did not touch, address anything

with attorneys' fees until we had it in writing what the class was going to get.  And it was an entirely separate negotiation.").

## VI.   Notice.

As part of the settlement agreement, the parties have created a thorough notice plan utilizing a variety of media.  All-Clad is paying to notify class members, and it is also paying for claims administration by its selected administrator, Angeion Group, LLC.  ECF 92, pp. 38-39.

Angeion has notified settlement class members by (a) emailing the notices to all members of the settlement class for whom valid email addresses are known to All-Clad, (b) mailing postcard notice to class members that did not have valid email addresses, but had mailing information, (c) implementing a digital notice program, and (d) commencing internet banner notice and social media notice.  Certain All-Clad third-party retailers also facilitated direct email notice, either directly or with transfer of email addresses to Angeion.  In addition, Angeion created a settlement website that includes all necessary and pertinent information, and also established and is maintaining a toll-free number for settlement class members to call and obtain additional information about the settlement.  *Id.* at p. 43.

Ultimately, Angeion sent email notice to 241,593 addresses.  ECF 92-2, PDF p. 3.  5,708 were undeliverable, but Angeion was able to find mailing addresses for 5,004 of them and sent postcard notices.  *Id.*  Amazon sent email notice to 490,674 unique customer accounts, and only three were undeliverable.  *Id.*  Williams-Sonoma emailed 40,000 customers, and only 206 were undeliverable.  *Id.*  Crate & Barrell successfully emailed all approximately 16,000 customers.  *Id.*  Using updated postal addresses, Angeion also sent an additional 59,119 postcard notices to customers without a valid email address.  *Id.* at PDF p. 4.  Online notice by banner ads and social media has led to over 65 million impressions.  *Id.* at pp. 4-5.

The Court finds that the form and methods of notifying the settlement class of the terms and conditions of the proposed settlement meet the requirements of Federal Rule of Civil Procedure 23, any other applicable law, and due process. The plan constituted the best notice practicable under the circumstances. And as discussed at the fairness hearing, the Amazon notice, in particular, may have been the best notice possible; because Amazon is so widely used, the contact information was the most up-to-date – resulting in a 99.99% "hit rate." *See id.* at p. 3; Hearing Tr., 31:10-17.

Finally, Angeion also caused timely notice of the settlement and related materials to be sent to the Attorney General of the United States and the Attorneys General of all U.S. states, territories, and the District of Columbia pursuant to the Class Action Fairness Act of 2005 ("CAFA"). The Court finds that such notification complies fully with the applicable requirements of CAFA.

### DISCUSSION & ANALYSIS

In cases like this one, where "the parties seek simultaneous class certification and settlement approval, courts should be even more scrupulous than usual when they examine the fairness of the proposed settlement." *In re: Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 322 (3d Cir. 2019) (cleaned up). That said, after examining the settlement in depth and hearing argument from the parties and one objector at the fairness hearing, the Court finds that the proposed agreement is fair.

## I.     The initial presumption of fairness applies.

At the outset, the Court notes that in this case, "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re National Football League Players Concussion Injury Litig.*, 821 F.3d 410, 436 (3d Cir. 2016) (cleaned up). Specifically, the parties engaged in two separate rounds of mediation, each facilitated by a third-party neutral. ECF 91-1, p. 8.

"[N]egotiation of a settlement through mediation suggests reasonableness and neutrality, not incompetence or self-dealing." *Rossini v. PNC Fin. Servs. Grp., Inc.*, No. 18-1370, 2020 WL 3481458, at *12 (W.D. Pa. Apr. 26, 2020) (Ranjan, J.) (cleaned up). The record establishes "extensive and costly investigation, research, and discovery have been conducted such that the attorneys for the parties are reasonably able to evaluate the benefits of settlement." ECF 78, p. 3. Class counsel – who have ample experience litigating class action suits – consulted with experts to investigate the alleged defect to better equip themselves to litigate the case. ECF 91-1, p. 9. And only a small percentage of class members indicated dissatisfaction with the agreement; in a class that appears to include over 800,000 members, only two objected, and 27 opted out. ECF 78, p. 3*; see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F. 3d 283 (3d Cir. 1999) (affirming approval of settlement where 19,000 out of 8 million class members opted out and 300 objected). All this counsels in favor of settlement.

## II. The factors set forth in *Girsh v. Jepson* also weigh in favor of approving settlement.

As required, the Court makes specific findings as to each factor below. *In re Pet Foot Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010) ("The district court must make findings as to each of the nine *Girsh* factors in order to approve a settlement as fair, reasonable, and adequate[.]").

### A. The complexity, expense, and likely duration of litigation.

"Generally, cases requiring great expenditures of time, money, and other resources on behalf of the parties and the court are good candidates for settlement." *Kapolka v. Anchor Drilling Fluids*, No. 18-1007, 2019 WL 5394751, at *4 (W.D. Pa. Oct. 22, 2019) (Ranjan, J.). Notably, a motion to dismiss and strike class-action allegations was pending when the parties submitted their proposed agreement. ECF 48. The Court denied it as moot, but stated that it would take up the motion if

the settlement agreement were not ultimately approved. ECF 79. Continuing litigation likely would have meant accruing fees not only from formal discovery, but also a flurry of additional motions, including motions challenging admission of expert evidence, class certification, and summary judgment. Resolving these issues and trying the case would, no doubt, last multiple years. In short, this is a prime example of a "complex case[] where substantial judicial resources can be conserved by avoiding formal litigation." *Gen. Motors*, 55 F.3d at 784 (citations omitted).

    **B.**     **The reaction of the class to the settlement.**

As described above, in a class whose membership is approximately 847,386, only two members filed objections, and 27 opted out.[3] ECF 92-2.

Further, the claims rate is relatively high. Again, considering a class size of 847,386 (the total number of unique mailings), the total claims rate of the class is about 14.5%. Broken down into the various options, the claims rates based on claims submitted as of February 2, 2023, are as follows:

| Options | Claims | Claims Rate |
|---------|--------|-------------|
| A1 | 101,825 | 12% |
| A2 | 4,124 | .49% |
| A3 | 6,961 | .82% |
| B | 10,581 | 1.25% |
| Total | 123,491 | 14.5% |

ECF 99.

---

[3] Upon closer inspection, it appears that there are likely fewer than 27 opt outs. Some of those opting out are potentially related or married (same last name), and so could potentially only have a single claim between them; and one person's name appeared twice. ECF 92-2, p. 39.

These claims rates are probably even a bit understated for at least two reasons. First, the class size that the Court uses includes all notices that were sent out and doesn't exclude the notices that may never be delivered.  Although the notice program was very effective, some undeliverables are inevitable.  Second, the claims period will not expire until March 27, 2023, and the claims administrator has predicted that about 5,000 claims will be submitted per week.  ECF 92-2, p. 7.  If that is accurate, then that would mean about 35,000 additional claims, and an even higher total claims rate of almost 19%.

This reaction to the settlement is positive and strong.  Objector John Andren points out some problems with claims-made settlements and assessing the claims rate in this case.  ECF 86.[4]  The Court appreciates the thoughtful objection on this issue filed by Mr. Andren's counsel, and addresses those valid concerns below.  But, for present purposes, the claims rates reflect a positive reaction by the class to the settlement.

### C.   The stage of proceedings and amount of discovery completed.

Based on the proceedings and discovery that already have occurred, the Court concludes that "the parties had an adequate appreciation of the merits of the case before negotiating" their settlement.  *Rossini*, 2020 WL 3481458, at *14.  As described earlier, class counsel worked with consulting experts to evaluate the alleged defect in All-Clad's cookware.  ECF 92, p. 39.  Some written discovery proceeded for over a year.  *Id.*  And the motions to dismiss and three days of mediation before retired judges provided ample insight into each side's positions, including strengths and weaknesses of claims and defenses.  This, too, weighs in favor of approval.

---

[4] *See, e.g.*, "We don't talk about claims rates (a Bruno parody by Edelson Creative)," available at: https://www.youtube.com/watch?v=L7ULPjEB85c.

**D.     The risks of establishing liability and damages.**

This factor is a cost-benefit analysis comparing class certification and litigation versus immediate settlement. *Rossini*, 2020 WL 3481458, at *14. Here, Plaintiffs' claims faced several difficulties. First, the Court might have denied class certification, precluding the possibility of providing relief to a nationwide class. That's because the ascertainability requirement in product-defect cases is sometimes difficult. *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 593-94 (3d Cir. 2013). Additionally, Plaintiffs might have lost on the pending dispositive motions or had experts excluded under *Daubert*. This factor weighs in favor of approval.

**E.     The risk of maintaining the class through trial.**

As explained above, obtaining class certification may have proven difficult in this case, or at least, involved significant time and expense, potentially including multiple damages and liability experts. Maintaining it throughout lengthy litigation would also be challenging, as All-Clad would likely seek decertification when appropriate and appeal any adverse rulings. If Plaintiffs failed at any stage, there would be no nationwide relief to the settlement class. Therefore, this factor weighs in favor of approval.

**F.     The ability of the defendant to withstand a greater judgment.**

This factor is not relevant to the Court's analysis because the parties represent that All-Clad's ability to pay was "not a relevant factor in the Parties' negotiations." ECF 92, p. 31; *Rossini*, 2020 WL 3481458, at *15 ("[A] defendant's ability or inability to withstand greater judgment is irrelevant when the record includes no evidence related to the defendant's ability to play an amount greater than the settlement, nor…any indication that this factored into settlement negotiations.").

### G.    The range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation.

For these last factors, the Court must "broadly assess the 'reasonableness' of the settlement by balancing Plaintiffs' best possible recovery against the risks of litigation.  Ideally, this assessment should include comparing the value of damages that the plaintiffs would likely recover if successful, offset by the risk of not prevailing, with the amount of the proposed settlement."  *Rossini*, 2020 WL 3481458, at *16 (citing *Kapolka v. Anchor Drilling Fluids USA, LLC, et al.*, No. 18-1007, 2019 WL 5394751, at *6 (W.D. Pa. Oct. 22, 2019) (Ranjan, J.)).

While this is a really important (maybe the most important) consideration, it is also difficult to assess accurately.  That's because the Court doesn't yet have a complete factual or legal picture of the parties' competing views.  For example, class counsel retained experts who opined on the defective nature of the cookware.  Those opinions were never tested in the course of litigation or considered in light of any defense experts.  Moreover, while the Court is familiar with the legal arguments on many of the claims from the parties' motion-to-dismiss briefing, that too stops short, as it was likely that some of All-Clad's arguments would have been more properly resolved at summary judgment after a factual record was developed.  That is particularly the case with All-Clad's attacks on Plaintiffs' consumer-protection statutory claims.

That said, the Court can say one thing: within the motions to dismiss, All-Clad's legal arguments pertaining to the warranty claims seemed, on their face, to have a relatively strong chance of succeeding.  Indeed, the parties seem to have acknowledged this risk as well, given that the settlement is essentially structured as a claims process by which class members can invoke their warranty rights, by obtaining replacement products of different options.  In this way, the settlement

amount and structure are fair and account for some of the main legal risks that Plaintiffs would have encountered during litigation.

## III.    Additional factors also inform the Court's conclusion that the settlement is fair to the class members.

The Third Circuit has explained that when relevant, "it may be useful to expand the traditional *Girsh* factors to consider other matters[.]" *Rossini*, 2020 WL 3481458 at *12 (citing *Prudential*, 148 F.3d at 323). Three such matters are relevant here.

First, the Court compares "the results achieved by the settlement for individual class [] members and the results achieved – or likely to be achieved – for other claimants[.]" *Id.* In this regard, the settlement presents a very good deal for consumers. The products class members purchased and that All-Clad is replacing are of premium quality. *See* "The 3 Best Cookware Sets of 2023", *Wirecutter*, https://www.nytimes.com/wirecutter/reviews/best-cookware-set/#upgrade-pick-all-clad-d3-stainless-10-piece-set (describing All-Clad's D3 set as "hands down the best-quality cookware we tested in this price range" and, incidentally, including information about this settlement, including a link). A single piece of the cookware retails for between $80 and $500, with a whole set costing as much as $1,600. ECF 82, p. 4. Because of All-Clad's reputation in the industry, it is likely that a large percentage of class members would seek to replace their damaged products with the same or similar cookware, without the defect. This is the same result that customers could achieve by making a claim under All-Clad's lifetime warranty. ECF 49, PDF p. 14. But the settlement goes further: under one option, class members can also receive a $75.00 monetary refund.

Second, the Court considers "whether the procedure for processing individual claims under the settlement is fair and reasonable." *Prudential*, 148 F.3d at 323. It is. The settlement agreement provides detailed plans for claims review and

processing, including notifying class members whose claims are deficient, providing a quick window for submissions and returns, and creating a dispute-resolution process if a customer's claim is denied. ECF 77-1, § 4. At the fairness hearing, All-Clad indicated willingness to accept evidentiary photographs if submitting the physical cookware is a hardship for consumers. Hearing Tr., 25:2-26:21. And class counsel represented that they will remain involved throughout the claims process. *Id.* at 33:15-22. The Court finds that this process is sufficiently fair and efficient.

Third, the Court also addresses the "coupon" elements of the settlement. 28 U.S.C. § 1712(a). Specifically, a class member may submit a claim under Option A3 simply for a coupon (50% off up to future purchases, which has a $600 value). The Court is not concerned with this aspect of the settlement, as a qualifying class member need not select this option. It can pick Options A1 or A2. *Compare Gen. Motors*, 55 F.3d at 808 (vacating approval of a settlement where each class member received a coupon, but the district court did not account for class members' varying abilities to take advantage of that coupon). And for those class members who have products that have not experienced "sharp edges" or who have discarded their cookware, they are left with only a coupon (up to a $262.50 claim). This also is not concerning, as these class members likely have no real claims if they were to pursue their cases on an individual basis in litigation, given that they cannot prove the defect at issue. Including them within the class and giving them an option to obtain a coupon therefore is more of a windfall than anything else.

## IV. The Court takes into account Mr. Andren's objections and, by virtue of this decision, either overrules them or moots them.

As noted above, the Court received two objections to the settlement. One was filed by Gregg Kapuscinski and involved a concern over the timing of receiving replacement products. Class counsel negotiated a resolution with Mr. Kapuscinski, and he withdrew his objection. Further, in briefing and at the fairness hearing, the

parties represented that they had further discussed ways to expedite the claims process.  ECF 92, p. 28; Hearing Tr., 25:2-28:8.

The other objection was filed by Mr. Andren.  Mr. Andren, through counsel, objects on several bases, and the Court addresses each objection below.

First, Mr. Andren objects as to the fund created by Option A1 by arguing that it is unlikely that the $4 million fund will be exhausted (and so the remainder of it will simply revert to All-Clad).  ECF 86, pp. 5-6.  The Court overrules this objection because the number of claims submitted so far suggest that the fund has already been exhausted.  True, there is a chance that after the claims process is complete, claims may be disallowed, which could reduce the amount of the fund that is used.  But that seems unlikely (at least at a significant rate) for at least two reasons.  One, the criteria by which to assess the existence of the "sharp edges" defect (used to obtain the replacement product and the $75.00) is relatively objective and should lead to few disputes, as represented by All-Clad's counsel at the fairness hearing after questioning by the Court.  Hearing Tr., 25:2-26:21.  Two, the settlement agreement has a detailed dispute-resolution process[5] for resolving any claims disputes, and class counsel have represented that they will be involved in that process.  *Id.* at 33:15-22.  To further incentivize class counsel's participation in that process, the Court will delay reimbursement of a portion of the attorneys' fees award until the completion of the claims process.

Second, Mr. Andren is skeptical about the claims rates in this case because the claims process hasn't yet been completed, and he asks the Court to defer approving

---

[5] "If a Settlement Class Member objects to All-Clad's determination, he or she may notify the Claims Administrator within 15 days of receipt of All-Clad's determination. The Parties will meet and confer within 15 days of receipt of the Settlement Class Member's objection and, if the Parties cannot agree, the Claims Administrator will make a final determination on the Settlement Class Member's objection within 30 days."  ECF 77-1, p. 19.

the settlement until it has.  ECF 86, p. 8 n.4.  But deferring isn't necessary, because, as noted above, the Court believes the claims-resolution process is straightforward with appropriate dispute-resolution safeguards in place.  Further, even if it turns out that, say, one-third of the current Option A1 claims are disallowed, that would still signify a strong claims rate, and would still exhaust the entire $4 million settlement fund.

Third, Mr. Andren also argues that the settlement agreement's $2 million "clear sailing provision" on attorneys' fees renders the settlement unfair.  That is, the settlement agreement contains a provision by which All-Clad will not object to class counsel's request for attorneys' fees that do not exceed $2 million.  Mr. Andren objects because he argues that the combination of the settlement fund and clear-sailing provision create a constructive common fund, and the $2 million fee request is much too high of a proportion of that fund.  This is a good point, but ultimately a moot one.  This is so because, as discussed below, the Court will award class counsel fees here based on a lodestar calculation.[6]

Fourth, at the fairness hearing, Mr. Andren's counsel suggested that the real value in the settlement was the cash payments under Option A1, and not any of the replacement products.  He argued  that consumer preference here is for the cash over the product.  He contends that is why almost all of the Option A claims have been for the one with the cash option (A1), and not for Option A2 which provides two choices for sets of cookware only.  In other words, according to Mr. Andren, consumers don't care about the replacement cookware.  The Court doesn't see it that way, at least

---

[6] Mr. Andren essentially acknowledges that an award based on lodestar and class counsel's actual billing entries would essentially mitigate against the risk of class counsel obtaining too large of a piece of the pie.  *See* ECF 86, p. 20 (arguing that "the lack of billing detail in class counsel's fee submissions precludes the Court from employing the base lodestar method up front").  Pursuant to this Court's request, class counsel has since filed more detailed billing records.  ECF 101; ECF 102.

based on the nature of the premium products at issue in this case. Instead, the Court views the main benefit of the settlement as being the replacement product, as opposed to a cash payment.

Recall that the product defects in this case concerned the All-Clad stainless steel D3, D5, and LTD cookware. ECF 77-1, p. 5. This cookware was at a higher price point because it was stainless steel and was bonded. So Option A1 provides for replacements of those stainless steel products (albeit without the warranty for being dishwasher safe). The other product-replacement claim options are not for these same premium products. For example, Option A2 is for sets that are not stainless (they are non-stick surfaces) and retail at lower price points than the D3, D5, and LTD cookware.[7] In fact, a single D3 pan can retail for more than the entire 5-piece set under Option A2.[8] While it is never easy to assess consumer preferences, here it is reasonable to infer that the replacement products in Option A1 – which are expensive at retail and higher quality – are a predominant driver behind the high claims rate for Option A1 as opposed to the $75 check.

In fact, ironically, what the claims breakdowns might suggest about consumer preferences is that consumers actually don't care all that much about cookware that is dishwasher safe. This is so because the replacement products in Option A1 all no longer warrant being dishwasher safe, but the non-stick sets in Option A2 do state

---

[7] On All-Clad's website, the Essentials Hard Anodized Nonstick thirteen-piece cookware set retails for $700, and the HA1 Hard Anodized five-piece frypan set retails for $209.97. In contrast, a 14-piece fully stainless D3 set retails at $1,659.92. and a 10-piece fully stainless D5 set costs $1,559.94. All-Clad no longer carries LTD cookware on its website.

[8] For example, the 12-inch D3 fry pan with lid retails for $239.99, and the 6-quart D3 sauté pan retails for $249.99.

that the products can be used in a dishwasher.[9]  This is notable because it reinforces another important aspect of Option A1 – consumers don't really care as much about the "dishwasher safe" benefit of an All-Clad product, so much so that they overwhelmingly are replacing their stainless steel cookware with replacements that are not warranted as being dishwasher safe.  To the Court, this means that that Option A1 replacement product (even without the benefit of being used in the dishwasher) is a fair bargain.

For these reasons, the Court overrules Mr. Andren's objections.

## V.      The Court will grant class counsel's motion for attorneys' fees and costs, but with modifications.

In a certified class action, the Court may award reasonable attorneys' fees that are authorized by law or by the parties' agreement.  Fed. R. Civ. P. 23(h).  This compensates the lawyers for any benefits to the class that result from the attorneys' efforts.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

As discussed throughout this opinion, class counsel have been involved in this litigation since its inception and have spent significant time investigating claims and advancing the case.  As compensation for these efforts, the settlement agreement provides for a $2,000,000 "clear sailing" provision for attorneys' fees and costs, separate from the Option A1 settlement fund and the notice and administration costs that comprise the rest of the settlement.

As noted above, Mr. Andren argues that attorneys' fees should not be separate from the rest of the settlement fund, and class counsel and Mr. Andren further dispute how a percentage of the settlement should be viewed in awarding class counsel their fees.  The Court can mostly avoid this dispute by awarding class counsel their fees based on a lodestar calculation, and it does so here.

---

[9] *E.g.*,  https://www.all-clad.com/essentials-hard-anodized-nonstick-cookware-set-13-piece.html (advertising "VERSATILE & EASY CARE" and calling an Option A2 set "dishwasher safe").

### A. A lodestar award is appropriate.

Because the complaints at issue have statutory claims that provide for fee shifting, a lodestar calculation is appropriate. That is, in their separate complaints, the named Plaintiffs brought claims under statutes that provide for the prevailing party to recover its attorneys' fees and costs. *E.g.*, No. 21-cv-504, ECF 1, Count V (suing under Fla. Stat. § 501.201 *et seq.*, which provides that "[i]n any civil litigation resulting from an act or practice involving a violation…the prevailing party…may receive his or her reasonable attorney's fees and costs from the nonprevailing party"); No. 21-cv-505, ECF 1, Count II (suing under Cal. Civil Code § 1790 *et seq.*, which states that "[i]f the buyer prevails in an action under this section, the buyer shall be allowed by the court to recover…attorney's fees based on actual time expended[.]"); No. 21-cv-507, ECF 1, Count VI (suing under O.C.G.A. § 10-1-370 *et seq.*, under which "[c]osts shall be allowed to the prevailing party unless the court otherwise directs").

In light of these statutory claims, the Court finds that the lodestar method is an appropriate way for the Court to calculate fees and costs. *In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009) ("[U]nder our precedent, the lodestar method is often applied in cases where fee-shifting statutes operate." (citation omitted)).

A lodestar calculation is also fitting because this is not a true common fund case – it is a "claims-made" agreement. Therefore, as Mr. Andren points out, the total amount of funds actually made available to the class may therefore be too speculative to conduct a percentage-of-recovery analysis, which is another reason a lodestar calculation is the right approach. *See* ECF 86.

"[T]he Court first calculates the lodestar by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Kapolka*, 2019 WL 5394751, at *11 (cleaned up).

Following the fairness hearing and at the Court's request, class counsel submitted updated detailed billing records to the Court. ECF 101; ECF 102. According to their submitted calculations, the total lodestar as of October, 24, 2022, was $1,301,379.10. ECF 102-1, p. 5. And additional fees after that date amount to $135,836.40. *Id.* at p. 6. That's a total of $1,437,215.50 in class counsel fees. After carefully examining the billing rates and time records submitted, the Court finds that class counsel's lodestar reflects reasonable attorneys' fees expended. The rates are reasonable and in line with national and Third Circuit standards, and, given the duration and complexity of this case, the number of hours claimed is reasonable as well. The Court notes no inflated or problematic billing entries. While there was, at times, some apparent duplication of effort, that is to be expected since this case was brought as separate actions before creation of this MDL, and also involved separate firms that then merged.

### B.    A 1.35 multiplier is also appropriate.

Class counsel also request a lodestar "multiplier" to "reflect the risks of nonrecovery, to reward an extraordinary result, or to encourage counsel to undertake socially useful litigation." ECF 82, pp. 31-32. The Court agrees that a multiplier is warranted.

Class counsel request a total of about $1.9 million in fees. ECF 82, p. 33. In light of the calculated lodestar, this amounts to a 1.35 multiplier. This is a reasonable figure. As this Court has observed, "lodestar multipliers ranging from one to four are regularly awarded[.]" *Kapolka*, 2019 WL 5394751, at *12 (collecting cases) (citing *Prudential*, 148 F.3d at 341). The requested multiplier is on the low end of that range.

That said, the Court does not award multipliers as a matter of course, and the Third Circuit, in fact, requires courts to make specific findings justifying a multiplier. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005) ("Even when used

as a cross-check, courts should explain how the application of a multiplier is justified by the facts of a particular case. … Furthermore, the resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award." (cleaned up)).  Multipliers should be reserved for "rare" cases.  *Dungee v. Davison Design & Dev. Inc.*, 674 F. App'x 153, 156 (3d Cir. 2017) ("Any upward adjustments of the lodestar figure are permissible only in certain rare and exceptional circumstances, typically involving superior attorney performance[.]" (cleaned up)).  Indeed, oftentimes the lodestar fee itself already takes into account many of the normal bases that courts use for a multiplier, such as the complexity of a case (which would usually naturally increase the lodestar).  Here, the Court finds that the lodestar alone is not sufficient to account for class counsel's performance, for two reasons.

First, the lodestar here should be enhanced to account for class counsel's risks of non-recovery.  This is more significant in this case given that class counsel expended significant pre-litigation time and costs, such as costs in retaining a number of expert witnesses to obtain detailed analyses of the defects at issue (as reflected in the photographs and data, alleged in the complaints).  In the ordinary course of litigation, these expert costs can be deferred until well into discovery (and potentially even after summary judgment).  Here, if Plaintiffs lost, these significant costs would have been entirely sunk by class counsel.

Second, a multiplier here is important because there is still more work to be done, for which class counsel may not otherwise be compensated.  As noted above, the Court views the main benefit of the settlement to be the replacement products.  It is therefore critical that class counsel remain engaged throughout that process, and, in particular, represent the interests of class members that may have to proceed with the dispute-resolution procedures in the settlement agreement.  The requested

multiplier is warranted to award class counsel for this additional time they will likely spend, and also to incentivize class counsel to remain engaged.

Thus, the Court will grant the motion, enhance the award of attorneys' fees by a multiplier of 1.35, and award class counsel fees of approximately $1.9 million.[10]

### C.      The multiplier amount will be held back until the claims process is complete.

The Court finds that there is some benefit in holding back a portion of the attorneys' fees, as an incentive for class counsel to remain engaged throughout the claims process.  *See Prudential*, 148 F.3d at 334 (holding that "the district court's creation of a bifurcated fee structure was an appropriate an innovative response to the structure of the settlement, and well within its sound discretion").  This partially addresses Mr. Andren's objection, as well.  As such, the portion of the fees representing the 1.35 multiplier will be held back (approximately $500,000) and authorized for payment only after the claims process is complete.

---

[10]  In some cases, the Third Circuit has instructed district courts to use a second method to cross check the initial fee calculation.  *E.g.*, *Prudential*, 148 F.3d at 333 (advising that it is sensible for a court to use a second method of fee approval to cross check its initial fee calculation).  However, that usually happens when the fee is primarily based on a percentage-of-recovery method.  Here, it would make little sense to cross check the more concrete lodestar figure with a more speculative percentage-of-recovery method.  Indeed, one of the reasons that the Court is using the lodestar method is because of the speculative nature of using a percentage-of-recovery method in this case.  That said, even if the Court employed a cross check based on the estimated recovery, the parties have estimated that the settlement value is $6,310,000, and so the $1.9 million fee is about a 31.7% total recovery.  That is within the range of comparable fee awards.  *See Rossini*, 2020 WL 3481458, at *19 (cleaned up).  Notably, the parties' estimated value doesn't include the significant shipping costs for the refunds, which All-Clad must bear, and which significantly increase the value of the settlement.   Hearing Tr., 26:22-31:3.

**D.    Class counsel are entitled to be reimbursed for reasonable litigation expenses.**

Class counsel are also entitled to reasonable litigation expenses. *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d. 626, 658 (E.D. Pa. 2015) ("In the Third Circuit, it is standard practice to reimburse litigation expenses in addition to granting fee awards." (citations omitted)). Such expenses might include travel and lodging, transportation, depositions, copies, legal research, filing and witness fees, postage, etc. *See Yong Soon Oh v. AT&T Corp.*, 225 F.R.D. 142, 154 (D.N.J. 2004). Upon review of the submitted expenses, the Court finds that the submitted $59,805.56 in expenses is reasonable.

**E.    Service awards for the class representatives are not warranted.**

Plaintiffs request a service award of $2,500 for each class representative. Service awards are meant "to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs." *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 412 (S.D.N.Y. 2019) (cleaned up). As discussed at the initial conference in this case, when contemplating such awards, this Court requires that the named Plaintiffs make a sufficient showing to demonstrate their entitlement to such an award. After all, the named Plaintiffs are fiduciaries, and serve to protect the class's interests and guard against the principal-agent problems that could arise with class counsel.

The Court can discern no basis from the record to award any service awards to the named Plaintiffs here. At most, the named Plaintiffs "gathered documents and communicated information to class counsel, reviewed pleadings, and maintained regular contact with class counsel regarding the status of the action." ECF 82, pp. 34-35. But they did not assume significant risk in bringing these lawsuits, and they

did not materially participate in investigation or discovery.  The Court therefore is not persuaded that they merit additional individualized compensation, and so will decline to order service awards.

### **CONCLUSION**

For the foregoing reasons, the Court will certify the settlement class and grant the motion to approve the settlement.  The Court will also grant in part the motion for attorneys' fees, costs, and awards.  An appropriate order follows.


DATED this 17th day of February, 2023.          BY THE COURT:

                                                /s/ J. Nicholas Ranjan
                                                United States District Judge