IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

ALL-CLAD METALCRAFTERS, LLC.,      No. 21-mc-491
COOKWARE MARKETING AND SALES
PRACTICES LITIGATION


-----


   Transcript of Settlement Fairness Hearing held via Zoom
on Thursday, January 26, 2023, before Honorable J. Nicholas
Ranjan, United States District Judge.


-----

APPEARANCES:

  For All-Clad:          Buchanan, Ingersoll & Rooney, PC
                         by Christopher J. Dalton, Esq., and
                         Bridget J. Daley, Esq., and
                         Melissa Bayly, Esq.


  For the Plaintiffs:    Milberg, Coleman, Bryson, Phillips &
                           Grossman, PLLC
                         by Rachel Lynn Soffin, Esq., and
                         Martha A. Geer, Esq., and
                         Harper Todd Segui, Esq.


  Court Reporter:        Noreen A. Re, RMR, CRR
                         700 Grant Street
                         Suite 5300
                         Pittsburgh, PA  15219

   Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

1       P R O C E E D I N G S

2            THE COURT:  All right.  Good morning, everyone.

3   We're here today for a class action settlement fairness

4   hearing in this matter.  I'm the presiding judge, Judge Ranjan

5   here.  It's nice to see counsel again.  Before we get started,

6   there are a couple housekeeping issues I want to take care of.

7            One is this hearing is being held remotely by Zoom.

8   I would caution everyone who is on this line when you're not

9   speaking to mute yourselves.  That will prevent interference

10  and allow the court reporter to do her job.

11           I also caution everyone that under our local rules,

12  recording of this proceeding or streaming of this proceeding

13  is prohibited.  So to the extent anyone has started recording,

14  I ask you to stop that and to refrain from recording this

15  proceeding at any time.

16           And then the last thing is we're holding this

17  proceeding by Zoom in part because the class notice indicated

18  that that's what I was going to do.  But, for the record, I

19  hate Zoom.  I have come to despise it very much.  So except

20  for proceedings like this where you have a fairness hearing

21  with certain members of a national class action that either

22  want to observe or participate in the proceeding.  And so

23  that's one of the reasons why I have held this by Zoom today.

24           There may be technical issues I assume always pop up,

25  so please bear with us.  But I very intentionally wanted to do

this remotely here today to encourage participation or observation by anyone.  So with that, why don't we start by having counsel enter their appearances.

I'll begin with class counsel.  And, also, if counsel for the parties can also indicate to me who might be addressing the Court today.  I don't know if multiple attorneys will do so, but that would be helpful for me.

MS. SOFFIN:  Good morning, Your Honor.  Rachel Soffin, one of class counsel from Milberg.  I'm also here with my partners, Harper Segui and Marty Geer.  And I will be doing the majority of the talking, unless I say something wrong that needs to be corrected.

THE COURT:  All right.  Sounds good.  Good to see all of you again today.  And then for the defendant?

MR. DALTON:  Sure.  Good morning, Judge.  Chris Dalton from Buchanan, Ingersoll & Rooney in our New Jersey office.  With me are my colleagues Melissa Bayly and Sophie Marino, who is an in-house counsel with Group SEB in Lyon, France.  I'll be doing the talking, as necessary.

THE COURT:  All right.  Great.  Good morning.  Good to see you again.  I would note that we had one objector in this case, Mr. Andren, who retained counsel and filed the appropriate notice of intent to participate.  I think I see Mr. Andren's counsel on the call here today, Mr. Schulman.  Am I right?  You're representing the objector, Mr. Andren?

1          MR. SCHULMAN:  Good morning, Your Honor.  That's

2     correct.  Adam Schulman for Objector Andren.

3          THE COURT:  As I recall -- maybe counsel can correct

4     me if I'm wrong.  That was the only filing with respect to a

5     notice of intent to appear that I saw on the record.  So

6     certainly, Mr. Schulman, when we get to that portion of the

7     hearing today, to the extent you would like to address the

8     Court, that's fine by me.

9          It looks like you've complied with the prior order

10    with respect to making a record of an intent to appear.  I did

11    not receive any other filings within the deadlines of any

12    other individuals who would like to appear and speak here

13    today.

14         And so everyone who is on this call is more than

15    welcome to observe.  But pursuant to my prior order, only

16    individuals who filed the notice of intent to appear will be

17    allowed to address the Court today.

18         Before we get started, I did want to confirm with

19    counsel whether or not anyone intended to present any

20    evidence, exhibits, witness testimony, anything of that

21    nature.  Miss Soffin, from class counsel's perspective?

22         MS. SOFFIN:  Yes, Your Honor.  I don't have any new

23    exhibits, other than updated claims data that we received from

24    Angeion yesterday.  And, also, Class Representative Clare

25    Lavetio is here, in the event Your Honor would like to hear

1    from her.  She's certainly not intending to speak, unless you

2    have any questions.

3                    THE COURT:  Okay.  All right.  Thank you.

4    Mr. Dalton, from the defense side?

5                    MR. DALTON:  No, Your Honor.  We don't intend to

6    present anything other than to respond to any questions that

7    the Court may have.

8                    THE COURT:  All right.  Thank you.  I observed,

9    reviewed all the materials.  I found them to be very helpful.

10   That included the briefs and motions in support of approvals,

11   as well as the motion for attorney's fees.  I reviewed the

12   objections that were filed, including the various objections

13   filed by Mr. Schulman on behalf of Mr. Andren and the

14   responses.  And I've reviewed the various exhibits.

15                   My plan here today would be -- I think it probably

16   makes sense for me just to maybe upfront kind of ask the

17   questions that I had.  They might be a little bit scatter

18   shot, but I thought I would throw out the questions I had or

19   areas of inquiry that I have.

20                   Then I would let class counsel, Miss Soffin, you

21   know, you can make a presentation, provide updated information

22   and maybe address some of those questions.  Mr. Dalton, you

23   can do the same, if appropriate.

24                   And then after that, to the extent Mr. Schulman

25   wishes to make a statement or any argument with respect to the

1     objection he filed, I'll hear from him.  And then conclude,

2     again, by hearing any argument from counsel or any response to

3     that objection.

4            So with that as the roadmap, let me just -- again, I

5     apologize for it to be scatter shot.  But as I was preparing,

6     these are the kinds of inquiry on my mind that it would be

7     helpful for counsel to address.  One, Miss Soffin, you alluded

8     to it before, updated statistics and updated claims data.  On

9     that topic, one thing that I'm not entirely clear on is the

10    class size or the estimated class size in this case.

11           I think I get a grasp on it, but it would be helpful

12    for there to be some confirmation.  When I say I was a little

13    bit unclear on it, I think it was from one of the declarations

14    by Angeion that indicated roughly about 300,000 addresses,

15    about 240,000 E-mail addresses and I think another 59,000

16    mailing addresses that they had.

17           And then, in addition, it appeared that there were

18    E-mails sent by Amazon, Williams Sonoma and Crate and Barrel.

19    So the question in my mind might be, just as a point of

20    confirmation, whether any of that, the third-party E-mails are

21    duplicative of the E-mails that Angeion sent directly to the

22    class or if they're all kind of -- I should aggregate all

23    those numbers to determine the class size in this case.

24           And then on the data, just an update on the number of

25    claims.  I would be curious of class counsel's prediction of

1     about -- I think it was 5,000 claims per week held true over

2     the last few weeks, because I think the last data I saw was

3     from early January.

4            So there has been a couple more weeks of data.

5     Within that, also it would be helpful for me to have a

6     breakdown of the claims with respect to the option selected as

7     it's updated.  And also on the data point -- and I don't know.

8     Counsel may not know this.  But when I looked at the opt-outs,

9     I think there were about 27 opt-outs.  I certainly would

10    appreciate confirmation on that.

11           When I looked at the opt-outs, it looked like there

12    could have been duplicative opt-outs.  For example, I saw one

13    person's name appear a couple of times.  I saw several people

14    that looked to have the same last name.  So I would infer that

15    to potentially be spouses or husband and wife or related in

16    some way.  So any additional information on that would be

17    helpful.

18           And then confirmation.  I don't think anything has

19    changed, but I believe there were two objections.  That's sort

20    of one area of inquiry, just kind of an update, clarification

21    on the data.  The second, of course, mailing.  I think I have

22    a good handle on the notice that went out to the class and the

23    efforts of the class administrator to send the notice out by

24    mail and to do the re-mailing.  Certainly I think maybe a

25    refresher on that might be helpful.  And any time there is an

1    E-mail notice, I do have some concerns over how much of that

2    might go to SPAM.  I don't know if that's something that is or

3    could be addressed in this proceeding.

4         The other area of inquiry is, I guess, I would like a

5    better sense of the process for the refund and replacement

6    products, including the dispute resolution aspect of that and

7    also the criteria for assessing the sharp edges defect,

8    whether or not All-Clad or the parties have discussed the

9    criteria for it.

10        In my mind, I think that's one of the most critical

11   parts of the settlement here.  It seems to me the greatest

12   value that goes to the class members in this case, the

13   opportunity to have what appears to be a brand new premium

14   replacement product.  But that, of course, depends on a

15   determination of the prior product having sharp edges or not.

16        I would like to get a better sense as to whether or

17   not there are criteria, whether counsel envisions there being

18   gray areas or problems in assessing, you know, what has a

19   sharp edge or doesn't have a sharp edge.  And also with

20   respect to the dispute resolution proceedings on that, whether

21   or not it's envisioned that class counsel would remain

22   involved and be part of that meet-and-confer process, if there

23   are any individuals who submit claims and dispute --

24   Mr. Dalton, can you hear me?  Can everyone else hear me?

25        MR. DALTON:  I'm sorry, Judge.  You cut out on me.

1    The predicted technical failure has occurred.

2            THE COURT:  Okay.  Can you hear me now?

3            MR. DALTON:  I can, indeed.  I'm sorry.  Your Honor

4    was asking for an outline, if you will, of the process for the

5    claim submission, the determination of the sharp edges issue.

6    And then my computer decided to cut you off.

7            THE COURT:  Okay.  So just to back up --

8            MR. DALTON:  Sorry.

9            THE COURT:  I would like to know whether or not class

10   counsel would participate in the meet-and-confer process to

11   resolve any disputes that anyone might have pertaining to

12   All-Clad's determination of sharp edges or lack thereof.

13           The other area of inquiry would be on valuation.  And

14   when I talk about valuation to the class, I would like to look

15   at it maybe -- not in a different way, but maybe put a more

16   final level of detail as to what I'm thinking of here.  And

17   that would be I would like to get a better sense of the costs

18   to All-Clad, specifically the products, product costs and also

19   the shipping costs.

20           As I understand the settlement, All-Clad covers the

21   shipping by the customer, the class member, to send a

22   defective product back to All-Clad.  And then All-Clad covers

23   the shipping of the new product.  So I think it would be

24   helpful for me to understand not only the cost of the product,

25   anticipated costs of shipping and any other costs that are

1    incurred or anticipated to be incurred by All-Clad as part of

2    this settlement, because I think that will help me assess the

3    value of the settlement here.

4         I noted from one of the filings -- it might have been

5    the Angeion declaration that they fielded about, I think -- I

6    think it was about 500 calls by various class members or

7    potential class members.

8         I would like to get a sense, to the extent class

9    counsel knows or both counsel knows, as to whether there are

10   any kind of common questions that were raised by class members

11   to either the class administrator or to class counsel

12   directly, common questions or common concerns that might have

13   been addressed and any responses that Angeion or counsel gave

14   to any potential class members.

15        I know that there was a settlement, also, with

16   respect to the one other objector.  I can't remember his name.

17   I think it began with a K.  And I believe his objection

18   pertained to the delay in terms of getting the new products,

19   which I found to be actually something I would have never

20   thought about.  But being without your pots and pans for

21   30 days or a few months or however long is actually a

22   legitimate issue.  So I understand from the filings that there

23   was a discussion over that and maybe a resolution there.  So

24   any information on that would be helpful.

25        And then with respect to the attorney's fees and

1   service fee awards, as I think I told counsel early on in this

2   case, on service fee awards I really look to see what the real

3   value is of the named plaintiffs with respect to their

4   involvement in the case before I award any kind of service

5   fees.  I'm not inclined to award a service fee simply because

6   those types of fees have been awarded in other cases.

7           So I'm looking for actual -- not only value, but,

8   really, as I think as counsel knows, the named class members

9   are fiduciaries of the class and really are the people that

10  are designed to ensure that there are no principal agent

11  problems with respect to the relationship between class

12  counsel and the class.

13          And so to the extent -- and I think, Miss Soffin, you

14  mentioned one of the named plaintiffs is on the line.

15  Certainly she can address me.  Or, Miss Soffin, maybe you can

16  address her role, as well as the other named plaintiffs' roles

17  in the class.

18          And then the last thing is, obviously, the attorney's

19  fee motion.  And I think the request contemplates an award

20  that would have within it a multiplier of about 1.5.  I would

21  like to get a better understanding as to the rationale behind

22  a multiplier.  And also the process for negotiating the fee in

23  this case I think would be really helpful for me to address

24  whether or not that was negotiated separately, whether it was

25  negotiated altogether, whether it was contemplated that this

1      was, in effect, a $6 million common fund or a $4 million

2      common fund with simply a separate fee ask.  And then on the

3      fee issue -- this might come up with respect to the objection

4      that Mr. Schulman had filed on behalf of Mr. Andren.

5           The timing of a fee award, whether or not it makes

6      sense to award it now, defer until the claims process is over,

7      do some combination of both, a partial award now with a

8      holdback.  So to the extent that there is an objection over

9      the fees, whether or not the timing would address any of those

10     objections.

11          So those are the areas of inquiry, at least off the

12     top of my head, that I certainly hope would be addressed.  I

13     might have some other questions as counsel goes on.  Again, my

14     apologies.  It's a little bit scatter shot, but hopefully you

15     can incorporate and maybe you probably already planned on

16     addressing a lot of those issues.  I thought it might make

17     sense for all of you to know my thinking before you got into

18     any presentations here today.

19          So with that, Miss Soffin, I would be glad to hear

20     from you as to why I should approve the settlement in this

21     case.

22          MS. SOFFIN:  Thank you, Your Honor.  I can readily

23     address each one of your points and hopefully in a very good

24     order with just a little bit of an intro here.  I would like

25     to also give you a background of not only our hard work pre-

1    suit and during the investigation, but also our discussions

2    with defense counsel during mediation and to explain to you

3    some of the background just so you have a feel for how we got

4    to where we are today.

5         So we put this in our papers, but the way that our

6    firm works is -- particularly the group you have on here from

7    Milberg is we focus a lot on product defect cases, which are

8    really distinct from mislabeling cases.  We do everything, but

9    we've got a particular specialty there.  We don't ever file a

10   lawsuit unless we have expert involvement, because we take our

11   jobs very seriously.

12        We want to be able to not only present to the Court

13   that we've done our homework, but also to let the defendant

14   know we're serious and we've done our homework and we've

15   identified this defect and we're confident in the nature of

16   the defect, particularly the common nature of it.

17        So here we retained several -- two very well-

18   established engineering experts who performed, as we put in

19   our paperwork, microscopy, macroscopy, all sorts of

20   engineering techniques to help us determine what the problem

21   was.  So what we do when we're looking at a product defect

22   case is we interview consumers.

23        We look at the warranty claims or the consumer

24   complaints online.  And, ultimately, we determine that it's

25   ripe for us to take it to an expert and to invest our

1    financial resources and time into it.  And that's what we did

2    here.  And we were correct.  And, of course, they helped us

3    explain it on a level we would never be capable of doing,

4    because they have the expertise.

5            And with that, we included photographs in the

6    complaint that came from our experts and a detailed

7    explanation of the defect, including the galvanic corrosion

8    that ultimately has led to the sharp edges.

9            And I won't bore everyone with that, because it's all

10   in the papers.  But I just wanted the Court to appreciate all

11   of the hard work and the behind-the-scenes things that are

12   really difficult to explain on paper and how seriously we take

13   our jobs and our fiduciary duty to the class.

14           So, ultimately, that led to the filing of lawsuits

15   across the country.  And then defendant moved for an MDL; and

16   we ended up before Your Honor after a lot of hard work,

17   briefing of the motion to dismiss in the Angeion action and

18   ultimately an omnibus motion.  We participated in not just

19   informal discovery, but formal discovery as well and received

20   back production information that helped us analyze the case;

21   the strength, the weaknesses and the value.

22           And one important thing, also, that we put in our

23   paperwork is when we mediated this in October, it was

24   unsuccessful.  We didn't rush to the courthouse.  We went back

25   and forth.  After a very long few days, we walked away.  And

1    we said, "Fine.  We're going back to litigation."  We are

2    certainly not a firm who takes the first offer that we have

3    and runs to the bank with it.

4         We take it very seriously.  We research the law where

5    we're located, including in the Third Circuit; and we want to

6    get real relief to the class.  And that's what we've done

7    here.  This is exactly why we filed the lawsuit was so people

8    could get new pots and pans; and, also, they happen to get $75

9    along with that, which is pretty successful.  Another thing I

10   wanted to note, turning to our relationship with defense

11   counsel, we obviously walked away from the first mediation and

12   continued to litigate.

13        But, ultimately, once we settled on a resolution -- I

14   have been doing this for 18 years, and I cannot tell you how

15   many times a defendant wants to have the least productive

16   notice plan.  Every time.  Let's publish in the East Coast.

17   Maybe someone on the West Coast will read it.  That type of

18   stuff happens so regularly, and it's very disappointing.

19        Here we told them we've been researching this, and we

20   have an opportunity to do direct notice through retailers.

21   And everyone knew that that meant that would have a higher

22   claims rate, because it's not just -- sometimes all we have is

23   publication, and that's the best we can do.  And the law

24   allows for that, and that's perfectly fine.  But where we can

25   do the best practicable notice, we will.  And we got

1   absolutely no push-back from defendant.  None.

2        I want the Court to know that, because I think it

3   helps to tell the story of how defendant actually wants to

4   correct the problem here.  And they want to participate in a

5   productive notice plan.  And so when we're telling them we can

6   do direct notice through Bloomingdale's and Amazon, which is

7   one of the largest retailers, and through themself and we got

8   no push-back, it's such a great indication of everyone being

9   committed to having a good settlement here.

10        So it ended up working out, because we have some

11   great responses.  And so I can get to your first question

12   here, which is we are actually above trend than what we

13   thought.  So we now have 115,614 claims.  And we still have a

14   few months to go.

15        I recognize that the objector said that the long

16   claims period was an effort to not report claims data, but

17   we've actually been consistently reporting claims data to the

18   Court.  I think this would be the third or fourth report.  And

19   it can show the trend, the upward trend.  And it's a wonderful

20   claims rate.

21        We've having a wonderful reaction.  Of those 115,899,

22   of that 94,529 picked Option 1, which is replacement plus

23   payment of $75.  So that shows you the vast majority of people

24   are seeking that $75 payment plus just a replacement pan.  And

25   that goes to why we think that the settlement fund is

1  ultimately going to be exhausted.  And that's pretty

2  reasonable.  We can accurately predict that.  Because as you

3  probably saw from our response to the objector, we've gone to

4  the most conservative number.

5         I think we cut it in half and then said even then,

6  we're going to exhaust the $75.  Also, importantly, I think as

7  Your Honor noted, we didn't even include all the other costs

8  to All-Clad that I'll let Mr. Dalton get into later.  That's

9  going to be twice, maybe three times the amount of the

10  $4 million.  We did not include -- again, I'll let Mr. Dalton

11  go to that.

12         We did not include that in our fee request, but I

13  think the law would have allowed us to, certainly, because

14  it's the value to the class would include the actual new

15  product.  It would include the shipping.  It would include all

16  of that.  But we didn't include that, because they were

17  comfortable with where we were.

18         THE COURT:  I think I understand this, but just to

19  confirm and clarify, so the $4 million, that just covers the

20  cash payment here; is that correct?

21         MS. SOFFIN:  Yes, Your Honor, it does.  And so none

22  of those other costs are going to be coming out of it.  Again,

23  I think that goes to All-Clad's commitment to the settlement

24  and a lot of the behind-the-scenes discussions that we had

25  here, which were pretty heated, particularly in October.  I

1     was accused of throwing my hands up a couple of times.

2          Then, ultimately, we went to February.  And we

3     continued our discussion, because we are all professionals.

4     And another thing that I actually want to throw out there on

5     this notice, I'm the settlement person, which is why you're

6     hearing from me today.

7          I'm so picky when it comes to our settlement

8     agreements that the amount of red lines being tossed back and

9     forth and the land mines that you can find all over the

10    settlement agreement are what I'm tasked with finding.

11         And so I also carry, along with Miss Segui and

12    Miss Geer, that same task post settlement.  We are not

13    assigning this to a staff person in our firm or third party.

14    They hear from us during the appeal process.  We had pretty

15    similar settlements against Sharp, Whirlpool and also General

16    Motors.

17         And I can speak to all of those, but I want to talk

18    about General Motors just a little bit.  That was for

19    replacement engine or repairs, and every single one of those

20    people came through me.  I don't know the first thing about

21    engines, but what I do know is how to communicate with an

22    administrator and a defense attorney.

23         And because of all the hard work, the case ended up

24    costing them $6 million more than they expected.  I kept going

25    back "Pretty please" about 300 times.  "This person really was

1    injured."  And we developed a nice relationship with them.

2    And, ultimately, that advocacy doesn't stop just because we've

3    gotten paid.

4         We truly care about our class members.  Again, in the

5    18 years I have been doing this, this is the first actual

6    objection that we've gotten that we haven't been able to

7    resolve in a case that I'm leading.  And so -- or one of the

8    first.  I want to throw that out there as well.

9         Option 2 -- by the way, I just droned on and on about

10   all the hard work we did.  But Option 2, 972 people to date.

11   Again, we expect this to trend upward.  That's Option 2-1,

12   replacement with a hard anodized HA1.  And, again, as we put

13   in our response to the objection, these are pretty expensive

14   products, several hundred dollars.  And so people are actually

15   having an opportunity to get a better product here, not just

16   replacement and $75, but something that might be even more

17   expensive.

18        And then, not surprisingly, the replacement with the

19   Essentials hard anodized nonstick set, there is almost 3,000.

20   So that's 2,961 people have claimed that.  They're getting a

21   whole new set of pans.  So what's really great about this

22   settlement and what we've actually tried to incorporate in our

23   settlements is recognize consumers have different preferences

24   when they're injured.  So we've given them multiple options

25   for relief.  So we all just like different things.  And so

1    they have the opportunity to choose three different options.

2         And then, of course, for those who haven't

3    experienced the defect yet -- and those are probably people

4    that are just anti-dishwasher.  So people are like that.  I

5    throw even my toothbrushes in the dishwasher.  So everything

6    goes in there in my house.  They could have the future

7    purchase credit, and that would be 10,401 people so far.  I

8    think that addresses your first question.  Am I missing

9    anything, Your Honor?

10        THE COURT:  The only thing, as I assess sort of the

11   claims rate, is the size of the class on that with respect to

12   the number as sometimes it's hard to do with duplicate

13   E-mails, spouses, that sort of thing.  But maybe you can put

14   maybe a little bit more detail on what you think the size of

15   the class is.

16        MS. SOFFIN:  Thank you, Your Honor.  I did forget

17   about that.  There should not be any duplication there.  So

18   All-Clad sent out -- provided E-mail notices for people who

19   actually purchased the product from All-Clad.

20        So it wasn't from like a list of names of people who

21   have registered a product, for example.  And Amazon, I believe

22   Amazon did it themselves.  Again, based on their own direct

23   purchasers.  And then a couple of the retailers provided

24   Angeion with their own direct purchases.  So every single

25   person in that 800,000-plus should have been a unique

1    purchaser.  Harper is nodding, so I said that right.

2          THE COURT:  So, then, if I sort of add up essentially

3    the mailings between Angeion and Amazon, Crate and Barrel,

4    Williams Sonoma, when I did it before, I got a ballpark of

5    about 800,000, a little bit more than that.  So that's your

6    understanding as well?

7          I know sometimes it can't be figured out to

8    precision, but here there's not a situation where -- I guess

9    what I was not entirely sure about -- and I think you

10   addressed it -- is whether or not some of the notices that

11   went out directly by Angeion were duplicative of purchases

12   through the retailers.  And it sounds like that's not the

13   case?

14         MS. SOFFIN:  That is the not case, Your Honor.  They

15   are unique purchasers.  I think you also had a question --

16   your SPAM question was in my next.  I'll get there.

17         THE COURT:  Just give me a second here.  (Pause.)  If

18   I'm doing the math right, then the claims rate roughly at

19   least as of today is about 15 percent; is that right?

20         MS. SOFFIN:  That sounds about right, Your Honor.

21   We're pretty proud of that number.  We usually stay in the

22   three to four percent range with publication.

23         THE COURT:  Can I ask you this, and this is -- maybe

24   this is based more on counsel's prior experience.  But do you

25   see a higher -- in my mind sort of common sense would dictate

1    a higher claims rate for a premium product.  I'm trying to

2    think of a products case where it would be more in the -- not

3    necessarily consumer product, but something that's not a -- I

4    would like to refer to -- and maybe the All-Clad people like

5    me to refer to it as a premium product.

6         It's not like the pots and pans I have in my house

7    that I got from -- I don't know, Kohl's, many years ago when

8    we registered for our wedding.  This is the good stuff.  And

9    so, I mean, how does that affect the claims rate in a case

10   like this and also just kind of the nature of a refund/repair

11   type of settlement process?  Bad question, but hopefully you

12   know what I'm driving at.

13        MS. SOFFIN:  I thought it was a great question.  And

14   I understand what you're asking, Your Honor.  The answer is a

15   little more layered than that.  I think the response rate that

16   we get is more about the relief than necessarily the product.

17   Certainly people that are able to access premium products

18   might have a better opportunity to submit a claim or more

19   opportunity.  That's just a reality of society.

20        Here I think because of the nature of the direct

21   notice that we were able to get, plus the replacement product

22   and cash component, I think it's the nature of the relief that

23   brought the higher claims, partially coupled with the premium

24   product.  But knowing that it was a premium product and

25   knowing the type of consumer that we were representing in the

1  class is what led to the relief that we have here as well.

2        THE COURT:  Okay.  All right.  Thank you.  I

3  appreciate it.  Please proceed.  I don't know if there is

4  other areas --

5        MS. SOFFIN:  I could just talk forever.  Ask anybody

6  who knows me.  But I'll try not to.  So the E-mail notices to

7  SPAM, I think they would -- they get bounced back.  I know

8  that.  I don't know if SPAM is going to lead to that.  But I

9  will say, given the number of claims that we have received and

10  the approximate 15 percent claims rate, I do not see SPAM

11  being any kind of problem at all here.

12        So the process for refund and replacement, I'm going

13  to defer to Mr. Dalton on that.  I will say that the one

14  objector that we had who was concerned about it -- it was a

15  fair concern, of course.  We have to cook our food.  We

16  immediately got on the phone with Mr. Dalton and Miss Bayly,

17  and we brainstormed about it and are confident -- I'll let

18  Mr. Dalton discuss it.  We're able to get this down to a few

19  weeks.

20        And there are approaches that we're talking about,

21  including sending pictures and things like that.  I can only

22  anticipate, because of our relationship with defense counsel

23  and because what we know of All-Clad as a company, that we're

24  just not going to have that hard of a time in the claims

25  process here.  And they don't want people out there having a

1    pan with a sharp edge or one knowing that the consumer is a

2    dishwasher user is going to continue to manifest and get

3    worse.  I just don't foresee that problem.  I have been doing

4    this long enough to predict, but Mr. Dalton might have more

5    comments.

6              THE COURT:  Mr. Dalton, feel free to address that at

7    this point, if you can.  I think it's -- I'm glad,

8    Miss Soffin, you raised, also, the pictures.  I went on the

9    website, the class website, and was looking at the claims

10   form.

11             And I was almost -- I was kind of curious as to

12   whether or not there is a process such that you can upload

13   images of the photographs.  Because one issue I could see is

14   somebody -- and I think it's not only a negative to the class,

15   but a negative to the defendant here.

16             They pay for the shipping of a product, and it gets

17   there, and it's perfectly fine.  Because it's clearly --

18   either the class member misunderstood what the options are or

19   it doesn't have sharp edges.  And you paid for a shipment, and

20   I presume you paid for it to go back, and you don't pay the

21   claim.  I was kind of curious internally what the process was

22   for providing proof of the defect upfront before shipping.

23             MR. DALTON:  Sure.  If you don't mind, Judge --

24   Attorney Soffin, if you're okay with it, I'll address your

25   questions, Judge.  Yes.  Once we received that inquiry from

1    the other class member who did not want to be without his

2    All-Clad pans -- understandably, because they are fine

3    products, as Miss Soffin noted.

4          And because All-Clad and plaintiffs, we want to make

5    sure the class members get the relief in a timely fashion.  So

6    we have been working together, along with All-Clad internal

7    returns folks and the notice administrator, Angeion, to

8    streamline the process.

9          It is as Your Honor suspected.  What we are working

10   to do is that given the bulk of the claims are for -- 115,000

11   of these claims, the bulk of them are for replacement.  And

12   rather than have folks -- I was going to say out of pocket,

13   but out of pan for several weeks while it went through the

14   process, we're going to notify those folks that we're still

15   working through it, as Miss Soffin said.  Notify those folks

16   that we want to expedite the process for them, and here's how

17   we would like to do it.  Have them send in pictures of the

18   cookware, to Your Honor's point, just to ensure that it's the

19   D3/D5 or LTD cookware.

20         That's stamped on the bottom of the pan or the pot so

21   that very simply the class member can take a photo of the

22   bottom, demonstrate that it's the proper product that's at

23   issue here and then take a picture, photograph of the edge of

24   the pan or the top of the pot.  And I guess perhaps this is a

25   point, Judge, where we might have been able to provide, but we

1   do have some exemplar photos.

2          In fact, the class member -- the class

3   representatives' photos are very exemplary of the issue that

4   can, unfortunately, develop in certain instances.  It's

5   demonstrable.  You can see that the edge of the product --

6   it's in the papers.  The pans are layered clad materials.  So

7   there is either three layers or five layers.

8          At the top of the pan, the edge, if you will, it can

9   become thin.  It can become brittle.  I think one of our class

10  members actually cut his finger on the pan.  We don't want

11  that happening.  We don't want that happening.  And we want to

12  get these products out of the market as quickly as possible.

13         So to expedite that, have class members send in a

14  photo.  We can examine them, examine the photos as pretty

15  evident.  That's part of All-Clad's general warranty process

16  as well; let's take a look at what the issue is.

17         That will save the problem of somebody sending in

18  their cookware, being without it a couple, three weeks or I

19  don't know how long it might take, given supply chain and

20  processing.  So rather than have that happen, create a more

21  streamline and expedited process to examine and bring in the

22  products.  Of course, if it's on the fence, please send it in;

23  and we'll look at it.

24         The costs Your Honor asked about.  All-Clad's

25  shipping costs generally are -- we have an Enterprise package.

It's $30 roundtrip.  So if you're going to send a pan in, it
cost All-Clad $15 to send it in.  If you're going to send it
back, it cost $15 to send it back.  So every one of these
returns is going to be $60 out of All-Clad's pocket.  In
addition, the costs of replacement product under the
settlement, the structured range is basically anywhere from
$35 to $150.

We're talking a not insignificant amount of money.
And this is all in addition to and beyond the $75 payment for
those folks whose product did experience this issue and for
which All-Clad is standing behind the product and its
customers and its brand and trying to do right by their
customers.

Other costs that are coming up, Judge, is it looks
like, given the volume of claims, the notice cost, as
represented in the approval papers, are going to probably
exceed a half million dollars, notice and administration costs
to handle all of this.  And, to be quite candid, if you have
any family members down in Canonsburg that might need a job,
it looks like All-Clad is going to be hiring some part-time
folks, some temporary staff to help expedite this processing.

THE COURT:  I was going to ask about the staffing
here.  Sometimes these types of settlements that have
nonmonetary components seem like a great idea when you're
agreeing to them.  And then when you go back to your client,

1    it becomes a little bit more hairy when you're actually

2    administering it.  It sounds like there is going to be some

3    more manpower here needed.

4        MR. DALTON:  Judge, if you would like it, I can share

5    with you at this point a three-page flow chart for claims

6    processing.  That's not including the boxes and stuff.  That

7    is just all of the decision.  It's going to entail a good bit

8    of work at All-Clad and at Angeion.  But, ultimately, the end

9    result that we want to see is that the customers get what they

10   wanted and get it as expeditiously as possible.

11       THE COURT:  Can I ask you, in terms of -- well, there

12   is a couple questions.  One is I think you mentioned the $35

13   to $150.  Is that for the replacement products for Option 1

14   only?  My understanding is that the Option 2 one is a higher

15   value?

16       MR. DALTON:  Right.  Let me look it up now from the

17   client here.  The Option 1 starts at $35.  I don't have the

18   high end of that, but we're talking at a minimum of $35.

19   Option 2 is, I believe, $50.  And Option A-1, A-2 and A-2-B is

20   $150.  Again, the first option, the replacement option for the

21   cookware, as plaintiffs' counsel reflect in the papers, we're

22   talking about retail cost products that are $60, $100, $150.

23   Attorney Bayly may be able to speak to that more directly.

24   She received a set of All-Clad as a housewarming gift when she

25   moved last year.

1          THE COURT:  So, then, the $35 one is not -- that's

2     not the retail price.  Is that basically the cost without the

3     profit margin to All-Clad?

4          MR. DALTON:  Correct.  That's the base price.  And I

5     can say parenthetically that, as Your Honor might expect,

6     given recent challenges with the supply chain -- and I don't

7     mean to say this improperly -- margin has gotten thinner.

8     Costs are increasing.  So it's at least a minimum $35 cost.

9     And, again, it will go higher depending on the type and size

10     of the pot or pan involved.

11          THE COURT:  Just so I understand, did you say $30

12     roundtrip for shipping or $60?

13          MR. DALTON:  $30 roundtrip.  As long as you're not

14     doing an open draw, but you're going back and forth.  If there

15     is a third stop involved, it might cost more.  $30 roundtrip.

16     To put a point on it, it's not an insignificant cost that

17     All-Clad is going to incur here.

18          Let's say it's 100,000 exchanges or returns.  I don't

19     know what the ultimate number is going to be.  But we're

20     returning about -- Attorney Soffin can correct me -- 7,000

21     claims per week are coming in.

22          THE COURT:  As I'm doing the math, I'm just -- let's

23     just like -- Option 1, 94,000 people have selected Option 1.

24     Let's say they've all returned something of the lowest pot or

25     pan, which would be a cost to All-Clad of $35.  And let's

1    assume with that comes a shipping cost on top of that of --

2    would you add $60 to that to get a $95 cost for shipping plus

3    the product?

4            MS. SOFFIN:  $30 for the shipping.

5            THE COURT:  I'm sorry, $30.

6            MR. DALTON:  Let's call it a $65 exchange for the

7    very lowest end product times 95,000.  It's a big number that

8    starts with a six.

9            THE COURT:  You're looking at in excess of

10   $6 million.  Okay.  With respect, then, to Option 2, the two

11   product lines, again, if I'm right in understanding it, those

12   are necessarily going to be more -- are those necessarily

13   going to be more expensive?  My sense is those are sets as

14   opposed to --

15           MR. DALTON:  Those are sets, and those are fixed.

16           THE COURT:  Okay.

17           MR. DALTON:  That's not going to vary.  We are

18   receiving -- and I pulled it up here.  When I pulled it up,

19   that's what caused my speaker to go off.  We have a request

20   for about -- it looks like about 1,000 of the A-2, which is

21   the $50 replacement cost.  So we call that $80 times 1,000,

22   80K.  And then the third one is about 3,000 returns.  It's

23   $180 times 3,000.  That one I cannot do in my head.

24           THE COURT:  Okay.

25           MR. DALTON:  $520,000, I think.  Yes.

1          THE COURT:  That conveniently adds up to $600,000.

2          MR. DALTON:  So we're looking at almost, Judge,

3    $7 million in replacement product.  And returns, in addition

4    to the kind of hidden costs of additional staffing, just the

5    things it's going to take to necessarily process all of this.

6          Your point was well-taken that the devil is in the

7    details when you get down to this, which is we worked out the

8    relief for the class, which I think is very good, as evidenced

9    as being satisfactory based upon the response of the class in

10   this instance.  And implementing the relief is an additional

11   cost as well.

12         Your Honor did ask -- I have a recollection that

13   Amazon responded in terms of the efficacy of their notice.

14   And I believe that they had -- and my learned counsel will

15   correct me if I'm wrong -- almost a 99 percent success rate on

16   their E-mails.  Because, as you might imagine, we all keep our

17   Amazon accounts up-to-date, because we don't know when we're

18   going to need that next item from them, particularly given the

19   last two years of living off Amazon.

20         So I think we've got a very good penetration rate on

21   the notice.  And one other thing to what Miss Soffin

22   indicated.  My experience, Judge, a lot of it has been in the

23   automotive sphere.  I've had a couple decades of representing

24   a couple of auto manufacturers.  And in those instances, we

25   have the ability to obtain vehicle registration information,

which gives us, ultimately, the addresses of the various class members.

So I am accustomed to providing direct notice, as we've done here with this E-mail notice. I do think it's probably the best notice practicable, in addition to simply being E-mail notice. These are among All-Clad, Amazon, Macy, Bloomingdale's, Crate and Barrel, Williams Sonoma.

These are the primary retailers through whom All-Clad sells its products. It does some online sales itself, but predominantly through third retailers. These are the biggies accounting for pretty much most, if not all, of All-Clad's sales channels. So I really think we've done a good job of covering the waterfront of potential class members.

THE COURT: Okay.

MR. DALTON: And I'll stop talking and let Attorney Soffin continue.

THE COURT: All right. Thank you. No. That's very helpful. I appreciate it. Miss Soffin?

MS. SOFFIN: I have nothing else to add to that, unless Your Honor would like me to address something.

THE COURT: So just a couple of the other things. I think I had mentioned the calls that were fielded. To me that's kind of an important data point, if there is a common either question or complaint that was received. Do you have a sense as to any of those calls and whether there are any

1    common issues?

2         MS. SOFFIN:  Yes, Your Honor.  It won't surprise you

3    that the common issue we're getting is "How do I return my

4    cookware?"  And "When do I know?"  The wonderful thing about

5    this settlement and the direct notice and having all this

6    contact information for consumers is we can just update them

7    and tell them.

8         And we'll make sure that if we don't get them the

9    first time, we'll get them the second time.  And we'll

10   continue to follow up with them so that way they know.  We

11   don't ever want to be immobile when we're at this phase of the

12   settlement.  We want to make sure that we're modifying,

13   updating and doing the right thing.

14        So we're continuing to be mobile in that regard and

15   make sure that everyone is going to be able to return their

16   cookware.

17        THE COURT:  Then am I right that -- to the extent

18   there are issues that pop up during the dispute resolution

19   process, the sharp edges, Miss Soffin, are you and your firm

20   still going to be involved in that process on behalf of the

21   class?

22        MS. SOFFIN:  Yes.  We never leave them hanging.  It's

23   not going to be staff people.  It's going to be us ourselves

24   handling that.  That's, again, just a part of the package.

25        THE COURT:  Okay.  Then I think the other major kind

1   of issue, then, is just the attorney's -- service award and

2   the attorney's fee issue.  You can address that, too.

3        MS. SOFFIN:  Yes, Your Honor.  I'll start with the

4   service award first, because I think it's the less complicated

5   component.  Again, just the way that we practice law,

6   particularly in product defect cases, there is so much

7   involved from the class members; talking about exactly what

8   happened with their pans here, how they used it, how often

9   they put it in the dishwasher.  Then lending their name in a

10  public filing.

11       These people have lives.  They have jobs.  They're

12  not only putting their name in a lawsuit, but they know that

13  one day they may get deposed.  That's a really big deal.  I've

14  never sat for a deposition before.  I don't think I want to be

15  questioned by myself.  We don't need to get into the specifics

16  of that, Mr. Dalton.  It's a big deal to even make that

17  commitment.

18       And then what we do as a firm is we're regularly

19  communicating with our clients, updating here, responding to

20  discovery requests, letting them know they were available

21  during three days of mediation, multiple months of

22  negotiations of the settlement.  They understood everything

23  that we were doing with our experts.  And, of course, we had

24  to communicate with them back and forth, because you bring it

25  from anecdotal to confirming the actual problem.

1       So I can understand this hesitance to give service

2   awards, but I always -- when I have these discussions with

3   courts, I just want there to be an understanding that they're

4   just private people putting their names out into the public

5   world.  And the second they make that commitment, they don't

6   know where that's going to lead.  But we've given them an idea

7   of where it could lead, and that's a big deal.  They've been

8   very active, and we've been active with them.

9       THE COURT:  Okay.  Then on the fee issue, you know,

10  that's always a little bit difficult for me in a class action

11  setting with respect to multipliers.  Courts are all over the

12  place with respect to multipliers.  Anyone can cite any case

13  and say a multiplier of four is very appropriate or a

14  multiplier of ten is very appropriate or a multiplier of one.

15      I would like to provide some analytical honesty.  And

16  I think it helps counsel, including class counsel, in terms of

17  cases as to how a court is to assess whether a fee award

18  deserves a multiplier.  Maybe it's like what's the high-end

19  multiplier?  And what do you see as class counsel's ability to

20  get that sort of high-end multiplier?  What is sort of a

21  middle range multiplier?  And what is a no multiplier

22  situation?

23      MS. SOFFIN:  Well, Your Honor, our multiplier is

24  probably a lot lower now that we have final approval and given

25  all the back-and-forth that we've had to go through, but we

1    can go with what we put in there.  I would consider our

2    multiplier to be pretty moderate.  We've put in so much work

3    here.

4         You know, you have -- there is all kinds of

5    plaintiffs' law firms out there; right?  We're, again, the

6    type of law firm who is going to commit financial and labor

7    resources to a case before we even file it.  We don't file and

8    then worry about it later and hope that the defendant is just

9    going to be scared.  We want to give them a reason to be

10   concerned.

11        And so we've done that here with tens of thousands of

12   dollars in expert work, finding who we believe are the best in

13   the country, who not only identify the defect but were able to

14   provide us with photographic evidence of it.

15        That is not what everybody does.  I know that, having

16   been in this world for a while.  And we put pen to paper.  We

17   strategize about where to file across the country.

18   Ultimately, it ended up before Your Honor with the JPML.  But

19   we've put in just so much work and dedication.  And we were

20   right.  Not only did we commit the resources upfront, but we

21   were correct in ultimately it led to where we are today.

22        So I do believe we put in the work for this moderate

23   multiplier.  Again, all the litigation that's gone into it

24   after that.  The briefing, the motions to dismiss, the multi

25   mediations, walking away from the mediation because we didn't

1     at that moment believe that what we were talking about was a

2     sufficient benefit to the class.  And, ultimately, we got

3     there through productive communications with defense counsel,

4     lots of litigation and lots of expert work.  I could say that

5     300 different ways.

6          THE COURT:  Maybe walk me through the process of how

7     you kind of negotiated the agreement with respect to the fee

8     component.  I may have even said this maybe in our first

9     status conference.  I know that sometimes it helps a court

10    down the line when the process is -- you know, we reach a

11    deal; and we table attorney's fees for another time.

12          I know that doesn't always happen.  Because from a

13    defense perspective, maybe there is a pot of money they're not

14    going to go above.  Maybe walk me through that process.

15          MS. SOFFIN:  You're going to test my memory a little

16    here.  I can tell you in practice we don't ever touch, discuss

17    or even go to the place of attorney's fees until we have an

18    agreement in principle on all of the material terms of the

19    settlement.

20          That's risky.  Because sometimes when we do that, the

21    defendant is like "No.  We're going to leave it to the Court."

22    Or you're going to do lodestar only; no multiplier.  This

23    could just lead down to many different paths.  So we

24    absolutely did not touch, address anything with attorney's

25    fees until we had it in writing what the class was going to

1    get.  And it was an entirely separate negotiation.

2         THE COURT:  So on that, so you had the agreement with

3    the class.  Then I presume the separate agreement was

4    basically the clear sailing provision and how high or how low

5    that would be.  Is that a fair assessment as to the nature of

6    the fee negotiations?

7         MS. SOFFIN:  I think that's a fair assessment.  It

8    was certainly separate.  Miss Segui, did you want to jump in?

9         MS. SEGUI:  Harper Segui on behalf of the plaintiffs.

10   I was a little closer to some of the settlement negotiations

11   leading up to our final mediation.  But once this case was

12   consolidated before Your Honor, I think you know the history

13   of us re-engaging in settlement negotiations, but we didn't

14   request a stay of litigation, because we just weren't sure how

15   that was going to work out.

16        So specifically Mr. Dalton and I spent a good -- I

17   don't know, probably six or seven months, maybe, of

18   negotiating pretty regularly more so than we typically do

19   leading up to our final mediation with the goal of having the

20   material terms of the settlement and the benefits for the

21   class members really almost near final by the time we got into

22   that final mediation.

23        We just set aside one day with Judge Anderson, who is

24   a fantastic mediator and just well-respected mediator in class

25   actions and product defect cases as well and mislabeling, as

1     this is sort of a hybrid of that.  By the time we got in

2     there, we had pretty much hammered out just six or seven

3     months' worth of benefits to the class, truly.

4           And when we got in there, I think the attorney's fee

5     negotiation, that mediation went until about -- it was pretty

6     late at night, I want to say 10:00 or 11:00 or maybe later.

7     That was the very last component.  I mean, maybe like an hour

8     or two of that was the attorney's fees trailing at the end,

9     but everything else had been pretty much established and very

10    hard thought more so than a lot of our other cases.

11          I do want to also note, I have not incredible MDL

12    experience, but I have significant MDL experience.  And I will

13    say that for a plaintiffs' fee, this is the lowest I've ever

14    requested in an MDL context.  I realize this is a smaller MDL

15    than others for the reasons you've probably already seen; the

16    same attorneys, same cases, all of that, as opposed to a dog

17    fight that some MDLs can become.  This is, in our experience,

18    a pretty reasonable request.  So I will be quiet and let

19    Miss Soffin take back over.

20          THE COURT:  Thank you.

21          MR. DALTON:  Judge, if you want, this is Chris

22    Dalton.  I can just comment upon what class counsel said and

23    confirm.  We spent a significant amount of time prior to going

24    to Judge Anderson to work out the vast majority of the relief

25    to the class.  There were some open items that we just

1    couldn't agree on without the assistance of Judge Anderson.

2        Frankly, one of them was the monetary relief that's

3    provided here, the $75.  And that was a hard fought part of

4    it.  And then we kept -- we never talked about the question of

5    what the attorney's fees were going to be.  We adamantly kept

6    that off the table, and that's been my experience in doing

7    these.

8        Unfortunately, I have settled more class actions than

9    I would like to, but that's just because I'm a jaded defense

10   attorney.  But, no, we maintained the separateness of those

11   two items.  And that was -- the end result was facilitated

12   through Judge Anderson, and it was still a hard fought

13   position.  I do think Miss Segui might have been annoyed at

14   me.

15       THE COURT:  That's a good sign.  That is one of the

16   factors I considered.

17       MS. SOFFIN:  I don't deny it, too.

18       MR. DALTON:  Everybody was annoyed with me.

19       THE COURT:  Okay.  The last point, I guess.  And I

20   mentioned this before.  It may have come up in the context of

21   the objection that was filed, or maybe I was just thinking of

22   it.  Timing of any attorney's fee award and what is the

23   plaintiff requesting here and whether the timing of any

24   payment can address any of the concerns over the -- or the

25   objection raised with respect to the fee award in this case.

1          MS. SOFFIN:  Your Honor, I want to make sure I say

2     the right thing here, because it is certainly a touchy

3     component.  And I want to address all of Mr. Schulman's and

4     Mr. Andren's concerns and objections.  The law in the Third

5     Circuit, I think, allows district judges quite a bit of

6     discretion.  The way I have been sort of thinking about is,

7     you know, north, south, east, west.

8          There are so many things.  But what's the ultimate

9     thing that the Third Circuit requires?  I think it's two

10    things, if I'm processing a million cases that I read

11    properly, which is, one, can we determine with a reasonable

12    degree of accuracy what the ultimate benefits are going to

13    look like?  I think we've done that.

14         We've been consistently communicative with the Court

15    and with each other about what the claims are going to be.

16    Our estimates to the Court have now been exceeded.  We're at

17    more than 5,000 a week.

18         When we provided our response to Mr. Andren's

19    objection, we went to the lowest common denominator.  If I

20    would have known it was $30 shipping, I would have thrown that

21    in there.  I did $9.  We put in there really conservative

22    numbers.  We did not include in the valuation, obviously, the

23    other 6 million or so dollars that Mr. Dalton discussed.  I

24    think we could have.

25         I think the law would have allowed us to include that

1     relief.  It's not really nonmonetary.  They're getting an

2     entirely new pot and pan.  And it's monetary to All-Clad,

3     certainly.  They're going to feel that.

4           So, again, we were so conservative when we did this.

5     We negotiated the fee separately.  We did that three to four

6     range.  Obviously, All-Clad was taking -- hoping it would

7     probably be lower.  And we really believed it was going to be

8     higher because of the wonderful notice plan.  It was really

9     robust.

10          So I think we've met and even exceeded what the Third

11    Circuit requires in that regard about being able to estimate

12    what the ultimate claims are going to be.  It's going to be

13    we're likely going to exceed that $4 million with the

14    $75 payment.  That's pretty easy math right there.

15          The cost of the claims administration, which is -- I

16    understand that Mr. Andren cited -- or Mr. Schulman cited out

17    of circuit case law.  But each circuit does its own thing.

18    The Third Circuit clearly allows for notice and administration

19    cost to be included.  That has actually doubled the cost of

20    what we estimated.

21          I'm sure All-Clad's not happy about that, but it's a

22    hard cost; and they're going to have to pay it.  So that's

23    where we have the four and a half million.  And then there is

24    plenty of case law in the Third Circuit, including coming from

25    the circuit court itself, allowing for attorney's fees to be

1    determined in the entire pot.  And it's just semantics at that

2    point.  We could have called it a $6 million settlement, but

3    the fee would have been the same.

4         It really doesn't matter.  So that whole pot is

5    easily calculated at six and a half plus million, depending

6    where the ultimate claims administration goes.  It may end up

7    being higher.  Then, of course, all the other relief, which is

8    over $6 million.  This is easily a 12-13-plus million dollar

9    settlement.

10        Again, we wanted to be conservative.  We're not

11   greedy people.  So we went with the lowest common denominator

12   there.  So if the Court -- we think it can be paid now.  We

13   think we've met those burdens.

14        THE COURT:  Okay.  Thank you.  Anything else,

15   Miss Soffin?  I'll give you a chance to have the last word

16   here at the end.  At this point, anything else?

17        MS. SOFFIN:  No, Your Honor.  As long as I can

18   respond to Mr. Schulman after.  I think I've said my piece and

19   more.

20        THE COURT:  Thank you.  Mr. Dalton, anything else

21   that you would like to add at this point?

22        MR. DALTON:  No, Judge.  Nothing further at this

23   point.  I stand ready to answer any questions the Court has.

24        THE COURT:  All right.  Then why don't we hear from

25   Mr. Schulman.  Am I pronouncing your last name correctly?  Is

1    it Schulman?

2              MR. SCHULMAN:  Yes, Your Honor.  Thank you.

3              THE COURT:  All right.

4              MR. SCHULMAN:  Good morning.  I appreciate Your

5    Honor's engagement.  It's really nice to see that.  We don't

6    see that in every case we're involved in.  I also appreciate

7    class counsel's frankness in not trying to hide the ball on

8    claims data, which we've also seen in other cases.

9              And I think a lot of Your Honor's questions today are

10   zeroing in -- I'm not going to regurgitate everything that's

11   in the papers, our opposition, which I also thank Your Honor

12   for allowing response briefing for their motion for approval,

13   in addition to the objection.

14             But, ultimately, Your Honor is right that the

15   critical question is what at the end of the day is going to

16   come out of that claims process and the return process, more

17   specifically.

18             What they've put on the record so far is that the

19   administrator hasn't done even the preliminary review for

20   duplication, for completeness of the claims forms.  That's

21   preliminary to class members having to return their cookware

22   to the satisfaction of All-Clad demonstrating the sharp edges

23   issue.

24             So at the end of the day Miss Soffin says that it's a

25   conservative estimation that 50 percent will be paid out.  And

then if she's right, they will exhaust the $4 million.  If
they do exhaust the $4 million in actual payouts, we would
voluntarily withdraw our objection, as I've said in our
papers, because then you would have a proportional settlement.

But if, in fact, if they're losing claims all along
the way, if they're losing claims at the preliminary review
process, if they're losing claims at the submission process of
the cookware, if they're losing claims at All-Clad's review
process, they could easily get to a situation where it's no
longer -- it's not in proportion, and that remains our
concern.  It just hasn't yet been demonstrated to our
satisfaction that it will be proportional.

The idea of deferring a fee award, as mentioned by
Your Honor -- and it was in our objection -- it's a half
solution, because it would prevent a situation where they're
getting a disproportionate fee award.  But, ultimately, then
the money would be reverting to All-Clad that excess fee,
rather than to the defendant.

So we've seen in other cases where the defendant --
it seems that the defendant's confident that the $4 million
pot is going to be exhausted.  If that's the case, then there
should be no issue with them being able to relinquish their
reversionary interest in that fee award back to the class.
That would entirely resolve our objection, because that gets
rid of the segregated fee component.  It allows the class to

1  access the excess portion of the fee award, if it ends up

2  being excessive.

3      I really welcome the Court's questions, if the Court

4  has anything specifically.

5      THE COURT:  On the first point you made in terms of

6  the claims process and the D duplication and the potential

7  withdrawal of the objection, I mean, I guess walk me through

8  it, then.  In terms of with respect to your objection, what

9  would be the ask of me?

10     Would it be to defer approving a settlement until

11  there is a point in time where there is a validation of the

12  claims data such that we've removed the duplicates?  We've

13  determined that of the 94,000 people that selected Option 1,

14  it turns out 84,000 of them, there is no dispute that they

15  have sharp edges.  And at that point in time it's just a

16  matter of shipping back and forth.  And at that point in time,

17  from your perspective, there would be enough data to clearly

18  exhaust the $4 million, but beyond that to know what the

19  actual claims rates are.  Is that really the gist of what you

20  would be asking for?

21     MR. SCHULMAN:  Well, it's a tricky issue, because the

22  unique thing about this settlement -- and this is quite

23  uncommon in my experience -- is that the claims submission is

24  not the ultimate number.  Usually that is the ultimate number.

25     Once you can get the validation from the

1  administrator, you know that that amount is going to be paid

2  out to the class members.  Here we don't have that, because

3  you've got a further step of them having to return the

4  cookware.  So I think one way that that could be addressed

5  here -- and this is what we suggested in our opposition to

6  final approval, is that the parties -- obviously, you don't

7  have the authority to force the parties to amend their

8  settlement to remove the segregation of the fee component.

9        But if they removed that, then deferring the fee

10  would resolve our complaint.  Because the contingency of class

11  members not being successfully validated after they return,

12  then the risk is borne by both class counsel and the class,

13  not just the class.  And that's what we have here, if that

14  makes sense.

15        THE COURT:  It does.  But it also assumes something

16  about the attorney's fee component of the case, that it

17  assumes it's almost like a common fund the way -- or an

18  exhaustive common fund, I think as you argued, or constructive

19  common fund.  And a percentage of the fee is tied to the

20  common fund.

21        But in light of how this case was negotiated with

22  respect to the fee, I'm not sure it is necessarily a common

23  fund such that knowing what the final pot of money is would

24  necessarily determine what I do on the fee.

25        So maybe another way of thinking about it -- I was

1    thinking about this case a little bit in this sense.  Let's

2    just say this case played out in the ordinary course of

3    litigation and goes to trial and the plaintiff prevails on a

4    simple warranty claim or an unfair trade claim.  And

5    oftentimes the remedy could potentially be the return of the

6    product and then a request for a fee, if there is fee shifting

7    involved.

8         Setting aside the $4 million pot of money here and

9    all that, to me that's a pretty good deal.  What the

10   settlement in this case does, it seems to go above and beyond

11   that.

12        I guess it's a long-winded way of saying I struggle a

13   little bit with the argument that I should look at this

14   particular -- I sort of get it in other cases.  But in this

15   particular case I struggle with the argument that I should

16   look at this as a big pot of money and that the plaintiffs'

17   counsel is taking a cut of that such that by delaying the

18   process I'll get a better sense of how the money is allocated.

19   Does that make sense?

20        MR. SCHULMAN:  It does, Your Honor.  I would refer

21   Your Honor to the Third Circuit's decision in Community Bank,

22   which I believe is citing -- it's a 2005 decision.  Sorry I

23   don't have the cite off the top of my head.

24        It cites GM trucks, which makes fairly clear that

25   just the fact that it was separately negotiated doesn't mean

1    that it gets outside of the constructive common fund

2    structure, so to speak.

3         To do that, they would have to have the settlement

4    approved and then negotiate the fee after.  Another authority

5    this Court can look to, I think it's the statement on -- I'm

6    not sure if we cited this in our papers in this case.  The

7    Restatement Third of Restitution and Unjust Enrichment, which

8    talks specifically about even though at the end of the day if

9    they had gone through the litigation process, as you

10   hypothesized, and in that case the fee wouldn't be part of a

11   constructive common fund, because the defendant has never

12   willingly never put it in the constructive common fund by

13   agreeing to the award.

14        But when you do agree, then it does become a

15   constructive common fund.  I believe also Section 29 of the

16   Restatement Third on Restitution and Unjust Enrichment talks

17   specifically about that.  And the Home Depot case out of the

18   Eleventh Circuit, which I do think I cited, also discusses

19   that when an amount of money becomes a constructive common

20   fund or not.  And it's based on the defendant's willingness to

21   pay that in conjunction with the approval of a settlement.  So

22   before -- while the settlement is still pending.

23        THE COURT:  Okay.  All right.  Thank you.  I think I

24   understand the argument.  I appreciate the briefs that you

25   filed and certainly the position of the group you work with.

1    I think it's helpful to have some additional scrutiny in every

2    kind of class action settlement.  I further appreciate the

3    music video that you cited in your brief, which I watched a

4    few times, which I thought was great.  But thank you for that.

5    Thank you for your argument.

6          Why don't we give counsel for the parties the last

7    word, Ms. Soffin and Mr. Dalton, if you want to respond to

8    Mr. Schulman.

9          MS. SOFFIN:  Thank you, Your Honor.  The second part,

10   I was saving this to respond to Mr. Schulman.  In addition to

11   being able to reasonably estimate what ultimately is going to

12   be paid out, the second part, which is probably even more

13   important, is whether as class counsel we met our

14   responsibility to prioritize the direct benefit to the class.

15         Mr. Schulman and Mr. Andren do not object to the

16   nature of the relief.  And what class members are actually

17   getting is really confirmation that we have done that.  That's

18   exactly what we've done is prioritize what class members are

19   going to get.

20         I want to address one thing that Mr. Schulman says

21   when he says he'll withdraw his objection if we just make it a

22   traditional common fund.  When you tie that into prioritizing

23   the direct benefit of the class, I just want to juxtapose this

24   for a minute to the Court.  If we made it $6 million total,

25   our fee would look exactly the same.  None of that would

1   matter.

2          And so what difference would it make except to

3   potentially make sure that the defendant is sufficiently

4   punished, which isn't the priority here.  The priority here is

5   to, first of all, get the defendant to the settlement table.

6          Let's talk about what we do in litigation, right, on

7   the real level, get away from all of the intellectual

8   discussions about the case law, but in the real world what we

9   need to do is we need to get the defendant to the settlement

10  table as soon as possible so class members are not waiting out

11  there for ten years for relief.  And not only get them there

12  as soon as possible, but do a really good job and prioritize

13  the direct benefit to the class.  We've done that in the real

14  world on the litigation level.

15         So, again, this whole make it $6 million instead of

16  what we've got here, even though the plaintiffs will get the

17  same exact fee, because we would certainly fall into that

18  20 to 40 something percent of the fee, it would still be 1.9-

19  something million.  Nothing would change.  So I think that to

20  us it's a bit confusing, that argument.

21         To the case law, back to the intellectual things that

22  happen after litigation on the ground level, we've cited

23  Laniman for Your Honor, which confirms -- I mean, Laniman and

24  Comcast are such interesting examples.  And Laniman is a Third

25  Circuit case.  Comcast is a district court case.  But in

Laniman, Third Circuit, a 2016 case, fairly recent, the fund
was $625,000. Only 300 of the 20,000 people had claimed
benefits.

The attorney's fee was set to be $208,000, which is
one-third of the fund made available to the class. And,
ultimately -- I don't have it written down here. $58,000 of
the amount made available was all that was claimed. So, of
course, the objector came in. And they said, well, how is it
possible that the attorney's fee can be $208,000 when the
class members are only getting $58,000?

And the Court went back and said, "Let's look at what
matters." What matters is they've prioritized the direct
benefit to the class. Lots of things can happen in the claims
process. What we know here is that All-Clad wants to remedy
the problem.

Miss Segui, Miss Geer and I are going be in here
managing the claims process, which is our duty. And we're
going to do a good job of that, just like we've done in every
other product defect case. We take it very seriously.

We don't want consumers upset with us. All-Clad
doesn't want consumers upset with them. Here again, the Court
awarded the fee and said what matters is the benefit that you
made available to the client, citing baby food, citing Boeing.
It is the opportunity for class members to share in the
harvest.

1    And so Comcast, same type of thing, district court

2    case.  That was a settlement value up to $15.5 million, class

3    size of three and a half million subscribers.  Despite a

4    robust notice program, they had only 20,000 of those

5    3.5 million people filed claims totalling $211,000 and some

6    sort of additional, really, for $280,000.

7    So they said the courts approved the settlement, gave

8    the awarded class counsel a $1.1 million fee, despite the cash

9    payments totaling only $211,000, because of the $15.5 million

10   made available to the class, because of that risk that

11   defendant took in potentially having to pay that amount.

12   That is the harvest they made available for class

13   members to participate in.  Whether they did is not what we're

14   talking about.  We're not here to punish the defendant.  I

15   mean, that's part of the process, right, because they've got

16   to be held responsible for what we've alleged is their

17   misconduct.  But what's more important is, what are the class

18   members getting?  What is their opportunity to participate in

19   this?

20   So, there again, they approved the fee talking about

21   any claims that are not made -- although, here again, we're

22   pretty confident we're going to exhaust the fund, but any

23   claims here, it's not a failure of class counsel.  What

24   matters is, what was available?  What was the risk that

25   defendant bore?  I just wanted to point that out.

1          Again, Laniman is a Third Circuit case.  It's really

2     spot on here to what we've got going on.  And we've met and

3     exceeded what happened there, because we're going to exhaust

4     the fund.

5          THE COURT:  All right.  Thank you.  Mr. Dalton?

6          MR. DALTON:  I have nothing further to add, Judge.

7     Unless you have any questions.

8          THE COURT:  Okay.  I do not.  I appreciate the

9     information and argument and presentation from all counsel

10    here.  I appreciate everyone working very diligently and hard

11    in reaching a resolution.  I will say my inclination is to

12    approve this settlement.

13         As I said, I think the real value in this is to me

14    it's not the -- I think it's the cherry on top is the

15    $4 million fund, but I think the real value in this settlement

16    here is the premium, the new premium replacement products that

17    are being sent to these class members.

18         And so a settlement in a warranty case in which there

19    is a claim of a defect and the class members are getting a

20    brand new replacement product is to me essentially making them

21    whole.  And the fact that there is additional payment I think

22    is an additional benefit to the class.

23         That's why I asked the questions about the claims

24    process, because I think for me to approve it, the process for

25    processing these claims has to be very clear and very easy.

1      It sounds like from the discussions that counsel have had,

2      including with resolving the one objection, and the fact that

3      All-Clad is open to accepting photographs and class counsel is

4      going to be involved in the claims resolution process, if

5      there are any disputes, gives me confidence that what we're

6      not going to see is an illusory claims process such that --

7      certainly a concern raised by Mr. Schulman, such that there's

8      not going to be a value here with respect to the class members

9      getting their replacement products.

10            So I'm confident in that process, and I think the

11     settlement is fair from that perspective.  I'll take the

12     attorney's fee arguments and the petition under advisement,

13     along with the service award request.

14            I want to look at the cases that have been cited here

15     today as well as in the briefs and look at those more closely

16     and reach a decision on that.  I wanted you to hear my

17     thinking, at least.  And I appreciate everyone working hard,

18     and I appreciate the good work by all counsel here and the

19     participation also of Mr. Schulman on behalf of your client as

20     well.

21            MR. SCHULMAN:  Thank you, Your Honor.  Can I say one

22     thing to your initial inclination?

23            THE COURT:  Sure.

24            MR. SCHULMAN:  Which is there is two reasons I don't

25     think you should look at the replacement products as the

1    central relief in this case.  The first would be if you look

2    at the claims submission numbers that they give, the vast,

3    vast majority are for the $75 replacement of the low end

4    rather than the $700 retail cookware set.

5        Whereas, if that was -- so the revealed preference of

6    the class members is for the $75 cash relief.  That's the

7    first thing.  The second I would say is if, in fact, the class

8    members' pots and pans were so defective that they needed to

9    discard them, they can't even get that recovery under the

10   settlement terms, because they wouldn't have the pan any

11   longer; right?

12       So the fact the class members held onto the pans and

13   the fact -- the other objector mentioned this fact --

14   obviously, going without them for some length of time is going

15   to be a detriment to them.  It's not as if they're going from

16   a zero situation to a new pan.  There is some sort of an

17   offsetting cost there.  Just throwing that out there.  Thank

18   you.

19       THE COURT:  Okay.  Thank you.  I'll note and

20   appreciate that as I sort of take it under advisement.

21   Anything else, Miss Soffin?  Anything else from you and your

22   team?

23       MS. SOFFIN:  No.  Thank you for your time, Your

24   Honor.

25       THE COURT:  Thank you.  Mr. Dalton?

1       MR. DALTON:  No.  Again, thank you, Judge, for your

2   time and consideration here.

3       THE COURT:  All right.  Thank you, everyone.  I

4   appreciate it.  Take care.  Have a good day.

5                           -----

6       (Whereupon, the above-captioned matter was

7   concluded.)

8                           -----

9                   C E R T I F I C A T E

10          I, NOREEN A. RE, RMR, CRR, certify that the
    foregoing is a correct transcript from the record of
11   proceedings in the above-entitled case.

12

13

    s\ Noreen A. Re                    March 1, 2023
14   NOREEN A. RE, RMR, CRR             Date of Certification
    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25